**ZENITH ELECTRONICS CORPORATION, Plaintiff–Appellee,**

v.

**The UNITED STATES, Defendant–Appellant,**

and

**Mitsubishi Electric Corporation and Mitsubishi Electronics America, Inc., Defendants–Appellants,**

and

**Fujitsu General Ltd., Defendant–Appellant,**

and

**NEC Corporation and NEC Technologies, Inc., Defendants–Appellants.**

**Nos. 92–1043 to 92–1046.**

United States Court of Appeals, Federal Circuit.

March 19, 1993.

Rehearing Denied; Suggestion for Rehearing In Banc Declined April 29, 1993.

1574

Frederick L. Ikenson, of Frederick L. Ikenson, P.C., Washington, DC, argued for plaintiff-appellee. With him on the brief was J. Eric Nissley.

Robert E. Montgomery, Jr., Paul, Weiss, Rifkind, Wharton & Garrison, Washington, DC, argued for defendants-appellants, (NEC). With him on the brief was Frank J. Schuchat.

Kevin M. O'Brien, Baker & McKenzie, of Washington, DC, argued for defendants-appellants (Mitsubishi). With him on the brief was Thomas P. Ondeck.

David Newman, Siegel, Mandell & Davidson, P.C., New York City, argued for defendant-appellant, (Fujitsu). With him on the brief was Brian S. Goldstein.

John D. McInerey, Sr. Counsel, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC, argued for defendant-appellant (United States). With him on the brief were Stephen J. Powell, Chief Counsel for Import Admin. and D. Michael Kaye, Atty. Advisor. Also on the brief were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Velta A. Melnbrencis, Asst. Director, Commercial Litigation Branch, Dept. of Justice, Washington, DC.

Paul D. Cullen, Jeffrey S. Beckington and David C. Smith, Collier, Shannon, Rill & Scott, Washington, DC, were on the brief for amicus curiae, AFL–CIO/CLC.

Before CLEVENGER, Circuit Judge, SKELTON, Senior Circuit Judge, and RADER, Circuit Judge.

RADER, Circuit Judge.

Zenith Electronics Corporation (Zenith), an American television manufacturer, initiated an antidumping complaint against its Japanese competitors. The United States Department of Commerce (Commerce) assessed dumping duties against those Japanese television manufacturers, Fujitsu General, Ltd., Mitsubishi Electric Corporation, and NEC Corporation. The Court of International Trade reversed Commerce's application of a "circumstances-of-sale" adjustment to correct a purported distortion of dumping margins. *Zenith Elecs. Corp. v. United States*, 755 F.Supp. 397 (Ct.Int'l Trade 1990) (*Zenith II*). The trial court otherwise upheld Commerce's assessment. *Id.* Each party challenges as erroneous some aspect of the trial court's judgment. Because it discerns no error, this court *affirms* the judgment.

## BACKGROUND

The Court of International Trade adequately set forth the facts underlying this case. *Zenith II*, 755 F.Supp. at 401–03. Therefore, this court only summarizes the background of this case. A brief overview of antidumping laws places this background in context.

### The Antidumping Act

The United States antidumping laws protect domestic industries against dumping. Dumping is the sale of foreign manufactured goods in this country at less than the fair market value of those goods in the country of manufacture. The antidumping law authorizes the Secretary of Commerce to investigate dumping. 19 U.S.C. § 1673 (1988). If the Secretary determines that dumping exists and the International Trade Commission (ITC) also determines that dumping has injured or threatens to injure a domestic industry, the Secretary may impose a duty on the dumped goods. *Id.* The duty equals the excess of the foreign market value (FMV) of the imported merchandise over its United States price (USP). *Id.* This figure also represents the "dumping margin" for the merchandise, which the Secretary uses to determine whether dumping exists. Thus, the duty corrects the dumping margin.

The key issues in dumping disputes are the calculations of FMV and USP. When the foreign manufacturer sells goods in its own country that are identical or similar to

its exports, the foreign sales price of those goods in the "ordinary course of trade" is the FMV. 19 U.S.C. § 1677b(a)(1)(A) (1988). In the absence of reliable information about a foreign manufacturer's home country sales, Commerce may base FMV on the price of merchandise offered for export sale to countries other than the United States, 19 U.S.C. § 1677b(a)(1)(B), or on a "constructed value." 19 U.S.C. § 1677b–(a)(2), (e). In this case, Commerce calculated FMV based on sales prices in Japan, the home market of the exporters.

USP is either the purchase price or the exporter's sales price, whichever is appropriate. 19 U.S.C. § 1677a(a) (1988). "Purchase price" is the price at which a buyer in the United States agrees to purchase the merchandise from a reseller or from the foreign manufacturer. 19 U.S.C. § 1677a(b). "Exporter's sales price" is the price at which the foreign manufacturer or its agent first sells or agrees to sell the merchandise in the United States. 19 U.S.C. § 1677a(c).

Commerce adjusts its FMV and USP calculations both upward and downward to account for any factors unrelated to dumping that might distort the dumping margin. For instance, shipping costs, differences in commercial quantities sold at home and by export, rebated or uncollected duties, and rebated or uncollected taxes might distort the dumping margin. *See, e.g.*, 19 U.S.C. §§ 1677a(d), 1677b(a)(1), (4). These factors might affect the USP differently than the FMV and thus distort the dumping margin as an accurate measure of less-than-fair-value sales.

This appeal concerns several of these adjustment factors. In particular, the Antidumping Act protects against the creation or inflation of a dumping margin due to taxes assessed on home market sales but forgiven on export sales. *See* 19 U.S.C. § 1677a(d)(1)(C). Such taxes raise the FMV without affecting the USP, thus increasing the dumping margin. To account for home market taxes (not assessed on exports), title 19 directs Commerce to increase the USP calculation by

the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States, but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation.

19 U.S.C. § 1677a(d)(1)(C).

Title 19 also includes a general provision directing Commerce to adjust FMV to account for any aspect of the dumping margin due to differing circumstances in home market as compared with export sales. Specifically, section 1677b(a)(4) (1988) provides:

In determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value (or that the fact that the United States price is the same as the foreign market value) is wholly or partly due to ... (B) other differences in circumstances of sale[,] ... then due allowance shall be made therefor.

Department of Commerce Determinations

In 1985, Commerce's International Trade Administration (ITA) concluded an administrative review of alleged dumping of television receivers from Japan during the period April 1, 1980 to March 31, 1981. In its final determination, Commerce decided either that dumping did not occur or that dumping margins were *de minimis*. Television Receiving Sets, Monochrome and Color, From Japan, 50 Fed.Reg. 24278 (Dep't Comm. June 10, 1985) (final admin. review). In reaching its conclusion, Commerce adjusted for Japanese commodity taxes under section 1677a(d)(1)(C) by subtracting the amount of the tax from FMV, rather than by adding it to USP as required by statute.

The Court of International Trade reversed Commerce's final determination and remanded for recalculation of the adjust-

ment for Japanese commodity taxes. *Zenith Elecs. Corp. v. United States*, 633 F.Supp. 1382, 1402 (1986) (*Zenith I*). The trial court held that the Antidumping Act requires Commerce to account for foreign taxes by adjusting USP, not FMV. *Id.* at 1401–02.

After *Zenith I*, Commerce again reviewed charges of dumping by Japanese businesses, including appellants. This review covered April 1, 1982 through March 31, 1983 and March 1, 1985 through February 28, 1986. In 1988, Commerce published its final determination. Television Receivers, Monochrome and Color, From Japan, 53 Fed.Reg. 4050 (Dep't Comm. Feb. 11, 1988) (final admin. review). In this determination, Commerce identified dumping margins for and assessed duties against Fujitsu, Mitsubishi, and NEC.

In its 1988 determination, Commerce applied section 1677a(d)(1)(C) by adjusting USP, rather than FMV, to account for Japanese commodity taxes. Commerce then used circumstances-of-sale adjustments under section 1677b(a)(4)(B) to lower the FMV figures. Commerce explained that this latter step was necessary "to avoid artificially inflating ... [dumping] margins." 53 Fed. Reg. at 4051.

Due to the nature of Japanese commodity taxes, Commerce reasoned that adjusting USP alone distorted the dumping margin. This distortion stemmed from a "multiplier effect" inherent in the way Japan assesses its taxes. Japan assesses a commodity tax as a percentage of price, rather than on a per-unit basis. When a product's pre-tax home market price in Japan exceeds the same product's export price (*i.e.*, a dumping margin exists), the Japanese commodity tax will exceed the imputed tax added to USP under section 1677a(d)(1)(C). Thus, adjusting USP raises the dumping margin.

An illustration—borrowed from *Zenith I*, 633 F.Supp. at 1386 n. 9—makes this multiplier effect apparent. When sold in the home market, the pre-tax price (pre-tax FMV) of a hypothetical Japanese television model is $100. When sold for export to the

United States, the purchase price (USP) for the same model is $90. The absolute dumping margin for the television is therefore $10 ($100 − $90). The *ad valorem* (percentage of price) dumping margin would be 11.1% ($10/$90).

If the Japanese commodity tax is 15%, the tax on home market sales is $15; the after-tax home market price (FMV) is $115, assuming the consumer bears the full burden of the tax. The amount of tax rebated or not collected on the exported television, however, is only $13.50 (15% of $90). Adding this amount to the USP, as required by section 1677a(d)(1)(C), adjusts the USP to $103.50 ($90 + $13.50). The tax-adjusted absolute dumping margin (FMV − adjusted USP) is thus $11.50 ($115 − $103.50)—an amount greater than the pre-tax absolute dumping margin of $10.[1]

Thus, adjusting USP to account for the forgiven commodity tax causes an increase in the dumping margin not directly related to less-than-fair-value sales. Commerce therefore made a circumstances-of-sale adjustment to FMV to achieve tax neutrality.

Commerce also made several other disputed findings concerning the FMV calculations for appellants' merchandise. In calculating Fujitsu's FMV, Commerce for the first time included Fujitsu's television receiver sales to farmers' cooperatives. 53 Fed.Reg. at 4054. Farmers' cooperatives service farmers located in isolated, rural sections of Japan. Facing limited competition, the cooperatives sell televisions and other consumer goods at prices substantially higher than prices in other Japanese markets. A substantial percentage of Fujitsu's sales in Japan are to farmers' cooperatives.

Similarly, in calculating the FMV of NEC's receivers, Commerce for the first time included sales by all of NEC's sales companies in Japan. 53 Fed.Reg. at 4053. In prior investigations, Commerce had only included NEC sales in the Tokyo and Osaka markets. Commerce concluded that Fujitsu's cooperative sales and NEC's sales outside of Tokyo and Osaka fell within the

---

**1.** The *ad valorem* dumping margin, however, remains at 11.1% ($11.50/$103.50).

meaning of "principal markets" under 19 U.S.C. § 1677b(a)(1)(A). 53 Fed.Reg. at 4053. Further, Commerce reasoned that Fujitsu and NEC made these disputed sales "in the ordinary course of trade." 53 Fed. Reg. at 4054.

Commerce denied Mitsubishi and NEC circumstances-of-sale adjustments for warranty labor expenses. 53 Fed.Reg. at 4052, 4053–54. Mitsubishi and NEC each employed a related warranty service company to provide its warranty service in Japan. Because these service companies were related to the manufacturer, Commerce refused to deduct these labor expenses from FMV without a showing that the service company made a profit on the services provided to the manufacturer. Mitsubishi and NEC made no such showing. Therefore, Commerce denied Mitsubishi and NEC FMV adjustments.

Commerce adjusted NEC's FMV under the circumstances-of-sale provision to account for differences in warranty parts expenses. In calculating the adjustment, Commerce determined a per-unit charge for each NEC model by dividing the total parts charges for the model from a single year by the number of units of that model sold during the year. 53 Fed.Reg. at 4053. NEC contested Commerce's allocation of parts expenses on a single year, model-specific basis. NEC argued that Commerce should have calculated expenses out of NEC's books. NEC did not keep its warranty data on a model-specific basis. In sum, NEC contended that Commerce's method did not accurately reflect NEC's warranty expenses.

During the review period in question, NEC sold its televisions for export to the United States at the manufacturer-to-distributor level of trade. The price of the televisions in these sales, which Commerce used to calculate USP, reflected the cost of manufacturing the televisions, plus NEC's profit. These export sales prices, however, did not include costs of distribution, presumably borne by the purchasers of the televisions.

NEC sold its televisions in the home market at the wholesale level of trade. These home market prices, which Commerce used to calculate FMV, would include distribution costs and the distributor's (sales company's) profit. Thus, according to NEC, Commerce's FMV calculation includes distribution costs and profits not reflected in the USP.

Invoking 19 C.F.R. § 353.19 (1984), NEC sought a "level of trade" adjustment to its FMV. 19 C.F.R. § 353.19 (1984) [2] provided:

> The comparison of the United States price with the applicable price in the market of the country of exportation ... generally will be made at the same commercial level of trade. However, if it is found that the sales of the merchandise to the United States or in the applicable foreign market at the same commercial level of trade are insufficient in number to permit an adequate comparison, the comparison will be made at the nearest comparable commercial level of trade and appropriate adjustments will be made for differences affecting price comparability.

Commerce denied NEC's request for a "level of trade" adjustment. 53 Fed.Reg. at 4053. Commerce refused to adjust FMV to account for sales companies' profits. Further, Commerce determined that NEC did not show that its claimed distribution and selling expenses related to sales of models comparable to those exported.

### The Court of International Trade

Zenith, Fujitsu, Mitsubishi, and NEC appealed Commerce's determinations to the Court of International Trade. NEC's summons inadvertently misidentified the dumping review which it wished to appeal. Other documents accompanying the summons—the transmittal letter and information sheet—correctly identified the review. Upon discovering its mistake, NEC sought to amend its summons. Over the protest of Commerce, the trial court permitted NEC to amend its summons. *NEC Corp. v. United States*, 685 F.Supp. 258 (Ct.Int'l

---

**2.** At the time of the disputed review, regulations from 1984 were in effect. Commerce has since revised 19 C.F.R. § 353.19. 54 Fed.Reg. 12,742 (Mar. 28, 1989).

Trade 1988). The trial court then consolidated NEC's action with those of Zenith, Fujitsu, and Mitsubishi.

On review of the merits of the determination, the Court of International Trade reversed Commerce's circumstances-of-sale adjustment of FMV to account for the multiplier effect in Japanese commodity taxes. *Zenith II,* 755 F.Supp. at 407. The court otherwise affirmed Commerce's calculation of FMVs for Fujitsu's, Mitsubishi's, and NEC's products. Specifically, the court upheld Commerce's inclusion of Fujitsu's sales to farmer's cooperatives and NEC's sales outside of Tokyo and Osaka within its FMV computation. The court further upheld Commerce's denial of circumstances-of-sales adjustments to NEC and Mitsubishi for their warranty labor expenses and the denial of an adjustment to FMV for NEC's warranty parts expenses. *Id.* at 414–15. Finally, the trial court upheld Commerce's denial of NEC's requested level of trade adjustment.

## ANALYSIS

### Jurisdiction Over NEC's Complaint

■ Title 19 provides the Court of International Trade with wide discretion to make rules governing the content, form, manner, and style of a summons. 19 U.S.C. § 1516a(a)(2)(A) (1988). The court's rules allow the amendment of a summons "unless it clearly appears that material prejudice would result to the substantial rights of the party against whom the amendment is allowed." Ct.Int'l Trade R. 3(d).

The trial court permitted NEC to amend its summons. Commerce suffered no prejudice from NEC's amendment. Upon receiving a copy of the summons, Commerce immediately knew something was amiss because the determination noticed in the summons had already been fully litigated. NEC quickly learned of its mistake and notified Commerce and the court of the correct determination. Thus, NEC had corrected its miscue before Commerce took any action in the litigation. Commerce suffered no prejudice.

■ Moreover, viewing NEC's original filing as a whole, it satisfied the trial court's requirements for a summons. NEC's cover letter and information sheet correctly identified the antidumping determination that NEC sought to challenge. Absent prejudice to an opposing party, as specified by Ct.Int'l Trade R. 3, mere technical irregularities in the filing of procedural papers shall not deprive a party of its statutory right of review. *See, e.g., Kelley v. Secretary, Dep't of Labor,* 812 F.2d 1378, 1379 (Fed.Cir.1987); *FirstMiss, Inc. v. United States,* 7 Ct.Int'l Trade 52, 52, 1984 WL 14335 (1984); *cf. Foman v. Davis,* 371 U.S. 178, 181–82, 83 S.Ct. 227, 229–30, 9 L.Ed.2d 222 (1962). The trial court did not abuse its discretion by permitting NEC to amend its summons.

### Adjustment for Japanese Commodity Taxes

■ Title 19 explicitly requires Commerce to increase USP by the amount of tax that the exporting country would have assessed on the merchandise if it had been sold in the home market. 19 U.S.C. § 1677a(d)(1)(C). Section 1677a(d)(1)(C), the section dealing with tax adjustments, does not provide for any adjustment to FMV to correct for tax-related distortion of the dumping margin. As the trial court correctly noted in *Zenith I,* 633 F.Supp. at 1389–90, the sole provision of title 19 expressly addressing adjustment for home market taxes does not allow adjustments to FMV, only to USP. Thus, the language of title 19 provides specifically for tax adjustments to USP. Moreover, the specific provision of title 19 for tax adjustments does not permit changes to FMV.

The legislative history of the Antidumping Act confirms that adjustments to USP are the sole statutory allowance for forgiven taxes. During the process leading to enactment of the Act, the House of Representatives approved a provision which defined FMV to exclude excise taxes levied in the home market. *See* 61 Cong.Rec. 254 (1921). The Senate rejected the House definition and instead defined FMV to include these taxes. *See* S.Rep. No. 16, 67th

Cong., 1st Sess. 2–3 (1921). The Senate's provision, however, allowed upward adjustment of USP to prevent a dumping margin from arising solely due to a foreign government's forgiveness of taxes on exports. *See* S.Rep. No. 16 at 2, 12. The House–Senate Conference Committee responsible for reconciling the bills from the separate houses of Congress adopted the Senate provision. This version became law. The Antidumping Act, ch. 14, §§ 203, 204, 42 Stat. 9, 12, 13 (1921) (codified at 19 U.S.C. §§ 1677a(d)(1)(C), 1677b (1988)). Thus, Congress specifically rejected accounting for foreign commodity taxes in FMV, opting instead to adjust USP. Therefore, the trial court correctly directed Commerce to recalculate the dumping margins and duties in accord with section 1677a(d)(1)(C) and without adjustments to FMV.

■ The language and context of the general circumstances-of-sale provision do not permit that section to override the express language of section 1677a(d)(1)(C) for tax adjustments. The circumstances-of-sale provision contains no reference to taxes. Yet Commerce's application of the circumstances-of-sale provision to adjust FMV for foreign commodity taxes nullifies the USP-adjusting operation of section 1677a(d)(1)(C). The trial court properly interpreted the general circumstances-of-sale language to prevent it from effectively writing the specific tax adjustment section out of the statute. Indeed, if the trial court had permitted Commerce to use the circumstances-of-sale provision to account for forgiven commodity taxes, then section 1677a(d)(1)(C) would become completely superfluous. The trial court correctly presumed that section 1677a(d)(1)(C) is not a needless and useless statutory provision.

Perhaps more important, section 1677b(a)(4)(B) only permits adjustments to FMV to accommodate "differences in circumstances of sale." Commerce employed section 1677b(a)(4)(B) to correct the multiplier effect. The multiplier effect is a dumping margin variance caused by operation of the Antidumping Act, not by a difference in the circumstances of sale. Commerce, as directed by the trial court,

applied the tax adjustment provision to remedy the tax-related differences between the home market and export sales. Next Commerce applied the circumstances-of-sale provision to correct the operation of the Antidumping Act. The language of title 19 does not support this second step. Commerce did not employ section 1677b(a)(4)(B) to remedy a dumping margin variance caused by a circumstance of sale, but a variance caused by operation of the Act. The trial court properly corrected Commerce's misapplication of the circumstances-of-sale provision.

Moreover, nothing in the enactment history of the circumstances-of-sale provision permits it to trump the express and specific statutory language covering tax adjustments. Rather, the language and context of this general provision provide Commerce with authority to adjust FMV for differences in circumstances of sale not specifically covered by other sections of title 19. The Senate and House reports accompanying the 1958 circumstances-of-sale provision only list "differences in the terms of sale, credit terms, and advertising and selling costs" as circumstances warranting adjustment under the provision. S.Rep. No. 1619, 85th Cong., 2d Sess. 7 (1958); H.R.Rep. No. 1261, 85th Cong., 1st Sess. 7 (1957). None of these items are covered by another section of the Act. The circumstances-of-sale adjustment does not encompass adjustments for commodity taxes specifically covered by section 1677a(d)(1)(C).

The multiplier effect of section 1677a(d)(1)(C) when applied to Japan's ad valorem commodity tax does not alter this conclusion. By engaging in dumping, the exporters themselves are responsible for the multiplier effect. The multiplier effect does not create a dumping margin where one does not already exist. Only when pre-tax FMV exceeds USP and a foreign nation assesses an ad valorem domestic commodity tax does section 1677a(d)(1)(C) operate to accentuate the dumping margin. Without a dumping margin (when pre-tax FMV equals USP), even assessment of an *ad valorem* tax creates no multiplier effect. The multiplier effect thus occurs only when a dumping margin already exists. If a

foreign manufacturer does not export its wares at less than fair value, it will not suffer disadvantage from the operation of section 1677a(d)(1)(C).

Moreover, the enactment history of section 1677a(d)(1)(C) does not suggest that Congress sought tax neutrality when it fashioned the adjustment provision.[3] The Senate Report states that the provision prevents creation of a dumping margin due to commodity tax rebates, not the enlargement of an already existing margin:

> In order that ... any excise tax which is refunded or not collected upon the exportation of the merchandise shall not constitute dumping, it is necessary also to add such items to the purchase price.

S.Rep. No. 16 at 12. As noted earlier, Congress rejected the House of Representative language that would have achieved complete tax neutrality and avoided the multiplier effect by defining FMV to exclude home market taxes. Congress chose instead to adjust USP.

This court's holding in *Smith–Corona Group v. United States*, 713 F.2d 1568 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984), does not provide Commerce with the authority to avoid section 1677a(d)(1)(C) to achieve tax neutrality. *Smith–Corona* did not involve commodity taxes at all. Instead, *Smith–Corona* involved a disparity between FMV and USP created by the exporter's price offsets. Commerce corrected the disparity by regulation. This court upheld the regulatory adjustment. *Id.* at 1582–83. Unlike treatment of commodity taxes in this case, however, the Antidumping Act did not expressly provide a treatment for the exporter price offsets in *Smith–Corona.*

■ The Act is not silent about the disparity created between FMV and USP when a foreign government forgives commodity taxes on exports. Section 1677a(d)(1)(C) expressly directs Commerce to adjust USP. In the face of an unambiguous statutory directive, Commerce may only effect tax adjustments under that section.[4] *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.,* 474 U.S. 361, 368, 106 S.Ct. 681, 685, 88 L.Ed.2d 691 (1986). Because the Act expressly and unambiguously addresses treatment of forgiven taxes, *Smith–Corona* does not apply to this case.

Accordingly, this court determines that the trial court correctly ordered Commerce to compute commodity tax adjustments in accord with section 1677a(d)(1)(C), not the general language of section 1677b(a)(4)(B). The general circumstances-of-sale provision does not govern when the Act expressly provides a more specific treatment for foreign commodity taxes.

### Principal Markets

The Act defines FMV to include only sales made to "principal markets" in the "ordinary course of trade." 19 U.S.C. § 1677b(a)(1)(A) (1988). Commerce determined that Fujitsu's sales to farmers' cooperatives and NEC's sales outside of Tokyo and Osaka were sales in principal markets.

■ The Act does not define the term "principal markets." Without a statutory definition, Commerce construed "principal markets" as all markets in the country of export in which the exporter usually sells merchandise. Commerce excluded from the definition of "principal markets" those

**3.** During consideration of amendments to the Act in 1958, the Secretary of the Treasury informed Congress of the multiplier effect in the operation of section 1677a(d)(1)(C). The Secretary reported that the addition of imputed taxes to USP would achieve complete neutrality only when the pre-tax FMV equaled USP. *Report of the Secretary of the Treasury to the Congress on the Operation and Effectiveness of the Antidumping Act and Amendments to the Act Considered Desirable or Necessary: Hearings on*

*Amendments to the Antidumping Act of 1921, As Amended Before the House Committee on Ways and Means,* 85th Cong., 1st Sess. 13 (1957).

**4.** The statute by its express terms allows adjustment of USP in the *amount* of taxes on the merchandise sold in the country of exportation. While perhaps cumbersome, Commerce may eliminate the multiplier effect by adjusting USP by the amount, instead of the rate, of the *ad valorem* tax.

markets in which the exporter does not usually make sales. Applying this definition, Commerce presumed that, absent evidence to the contrary, all home market sales by NEC and Fujitsu were principal market sales.

Commerce applied a reasonable interpretation of the statute in this case. *See Chevron,* 467 U.S. at 843–44, 104 S.Ct. at 2782–83. Commerce routinely calculates USP based on data from all sales to the United States. By calculating FMV based on data from all Japanese home market sales, Commerce creates a reasonable comparison between FMV and USP.

■■■ Moreover Commerce's definition permits an exporter to provide evidence that any particular market in the country of export is not a "principal market." In this case, however, neither NEC nor Fujitsu presented evidence to support exclusion of the disputed sales from FMV calculations. Commerce properly placed on NEC and Fujitsu the burden of producing evidence showing that the disputed markets were not "principal markets." The burden of production should belong to the party in possession of the necessary information. *See Industrial Fasteners Group, Am. Importers Ass'n v. United States,* 710 F.2d 1576, 1582 n. 10 (Fed.Cir.1983). In the absence of evidence to the contrary, Commerce properly concluded that the principal markets for those companies' sales were all the Japanese markets in which they sold their merchandise.

■■■ Commerce's interpretation of the term "principal markets" did not constitute rulemaking without compliance with the Administrative Procedure Act, 5 U.S.C. § 553(b) (1988). As the Court of International Trade explained, *Zenith II,* 755 F.Supp. at 412, Commerce's interpretation of the term "principal markets" is not an unalterable rule that all Japanese markets are principal markets. Rather Commerce found that NEC and Fujitsu did not produce evidence to show that their disputed sales were not "principal markets."

■■■ Commerce also determined that Fujitsu sold to the farmer's cooperatives in

"the ordinary course of trade." The Act defines that term:

> the conditions and practices which, for a reasonable time prior to the exportation of the merchandise which is the subject of an investigation, have been normal in the trade under consideration with respect to merchandise of the same class or kind.

19 U.S.C. § 1677(15). Commerce regulations mirror this definition. *See* 19 C.F.R. § 353.46(b) (1992). The record reflects that, for years, Fujitsu routinely has sold a substantial percentage of its home market televisions to the farmers' cooperatives. Fujitsu produced no evidence to show that these sales did not fit the statutory and regulatory definition. Accordingly, the record supports Commerce's finding that Fujitsu sold to the farmer's cooperatives in the "ordinary course of trade." In sum, the trial court correctly upheld Commerce's determinations regarding "principal markets" and the "ordinary course of trade."

### Warranty Expenses

■■■ Commerce denied both Mitsubishi and NEC circumstances-of-sales adjustments for their respective home market warranty expenses. Commerce required each manufacturer to prove that its related service company made a profit on its warranty services. Commerce also calculated the adjustment for warranty parts expenses on a one-year, model-specific basis.

Section 1677b(a)(4)(B) gives Commerce authority to adjust FMV to account for differences in the circumstances of sale between the home market and the export market. The circumstances-of-sale provision expressly requires justifications for adjustments to satisfy "the administering authority." The statute provides no specific guidelines for the treatment of warranty expenses.

■■■ Exercising its authority under section 1677b(a)(4)(B), Commerce has consistently treated payments to related companies as intracorporate transfers of funds rather than as expenses directly related to sales. *See, e.g.,* Television Receiving Sets, Monochrome and Color, from Japan, 48

Fed.Reg. 12,221 (Dep't Comm. Feb. 13, 1981) (prelim.admin. review). Intracorporate transfers do not justify an adjustment of FMV under section 1677b(a)(4)(B). Commerce requires an exporter to show that its payments to related companies are at competitive rates. This requirement ensures Commerce to its satisfaction that suspect payments warrant adjustments to FMV.

■ Likewise, Commerce's properly allocated warranty parts expenses on a one-year, model-specific basis. Exporters incur warranty expenses, unlike other expenses, on a model-specific basis. Each time the exporter—in this case, NEC—incurs a warranty expense, it pays for repair of a specific product—in this case, a television. Commerce also presumed that per-unit warranty expenses for a specific model during a given year provide a reasonable estimate of the per-unit warranty expenses for that model during other years. Commerce thus reasonably computed to its satisfaction an estimate of NEC's warranty expenses.

Without express statutory provisions governing warranty expenses under the Act, the trial court sustained Commerce's reasonable treatment of those expenses under the circumstances-of-sale provision. *Chevron*, 467 U.S. at 843–44, 104 S.Ct. at 2782–83. This court discerns no error in the trial court's acknowledgement of Commerce's authority under the terms of the Act.

### Level of Trade Adjustment

■ Commerce refused NEC a "level of trade" adjustment under 19 C.F.R. § 353.19 (1984). The Antidumping Act does not address level of trade adjustments. Rather Commerce has by regulation provided adjustments to account for the difference between wholesale and retail market prices.

Commerce, however, closely scrutinizes the claimed selling expenses of a related sales company before granting a level of trade adjustment. Due to close relationships between the exporter—in this case, NEC—and the sales company, the exporter could potentially manipulate the sales company's expenses to obtain an adjustment without affecting its overall corporate profit. Commerce therefore requires the exporter to show that its related sales companies incurred expenses in the sale of merchandise comparable to its exports.

NEC did not show that its sales companies incurred expenses in selling the television models for which NEC sought the adjustment. Commerce did not exceed or misapply its authority in denying an adjustment. The trial court correctly upheld Commerce's denial.

### CONCLUSION

For the reasons stated above, the judgment of the Court of International Trade is affirmed in its entirety.

### COSTS

Each party to bear its own costs for this appeal.

AFFIRMED.