63 F.3d 1572
 17 ITRD 1673
 FEDERAL MOGUL CORPORATION, Plaintiff-Appellee,
and
The Torrington Company, Plaintiff-Appellee,
v.
The UNITED STATES, Defendant,
and
Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A.,
Defendants-Appellants,
and
NSK LTD. and NSK Corporation, Defendants,
and
Peer Bearing Company, Caterpillar Inc., Minebea Co., Ltd.
and NMB Corporation, Defendants.
 Nos. 94-1097, 94-1104.
 United States Court of Appeals,
Federal Circuit.
 Aug. 28, 1995.
 
 Frederick L. Ikenson, Frederick L. Ikenson, P.C., of Washington, DC, argued for plaintiff-appellee, Federal-Mogul Corp. Terence P. Stewart and James R. Cannon, Jr., Stewart & Stewart, of Washington, DC, represented plaintiff-appellee, The Torrington Co.
 Neil R. Ellis, Powell, Goldstein, Frazer & Murphy, of Washington, DC, argued for defendants-appellants, Koyo Seiko Co., LTD. and Koyo Corp. of U.S.A. With him on the brief were Peter O. Suchman and Niall P. Meagher. Kazumune V. Kano, Barnes, Richardson & Colburn, of Chicago, IL, argued for defendants-appellants, NTN Bearing Corp. of America, American NTN Bearing Mfg. Corp. and NTN Corp. With him on the brief was Donald J. Unger.
 Velta A. Melnbrencis and David M. Cohen, Attys., Commercial Litigation Branch, Dept. of Justice, of Washington, DC, represented defendant, The U.S.
 Robert A. Lipstein, Matthew P. Jaffe and Alice E.M. Aragones, Coudert Brothers, of Washington, DC, represented defendants, NSK LTD. and NSK Corp.
 Noel Hemmendinger and William J. Clinton, Willkie Farr & Gallagher, of Washington, DC, were on the brief for amicus curiae, American Ass'n of Exporters and Importers.
 Before MAYER, PLAGER, and CLEVENGER, Circuit Judges.
 Opinion of the court filed by Circuit Judge PLAGER. Dissenting opinion filed by Circuit Judge MAYER.
 PLAGER, Circuit Judge.
 
 
 1
 This case involves the manner in which the International Trade Administration, Department of Commerce (Commerce or Agency), in setting antidumping margins, accounts for taxes which are assessed on sales of foreign-manufactured merchandise. The taxes are assessed on merchandise sold in the country of origin, but are not assessed on similar merchandise when it is exported to and sold in the United States. Commerce, responding to a recent decision of this court, adopted a new methodology intended to create a tax-neutral result. The Court of International Trade took the position that, under the law, the new methodology was not a permissible one. Federal-Mogul Corp. v. United States, 834 F.Supp. 1391 (Ct. Int'l Trade 1993) (Federal-Mogul II ). For the reasons we shall explain, we think otherwise, and reverse the judgment of the Court of International Trade.
 
 BACKGROUND
 
 2
 This case is on appeal from a judgment of the Court of International Trade. At an earlier stage in the proceedings, that court heard appeals from Commerce's determination in this antidumping matter. See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan: Final Results of Antidumping Duty Administrative Reviews, 56 Fed.Reg. 31754 (Dep't Commerce 1991) (Administrative Results); Federal-Mogul Corp. v. United States, 813 F.Supp. 856 (Ct. Int'l Trade 1993) (Federal-Mogul I ) and Torrington Co. v. United States, 818 F.Supp. 1563 (Ct. Int'l Trade 1993). In those appeals, the matter was remanded by the court with instructions to Commerce to reconsider its treatment of the tax issue. Commerce did so, and issued its redetermination decision. That decision was again appealed to the Court of International Trade. The cases were then consolidated for purposes of the review by the Court of International Trade; they remain consolidated here. The plaintiffs throughout these proceedings, challenging the decisions of the Agency, are two domestic companies, Federal-Mogul Corporation and The Torrington Company. (Torrington by petition to the Agency initiated the administrative proceedings in this matter.) Defendants are the United States and a group of foreign manufacturers, importers, and sellers of the merchandise in question.
 
 
 3
 The detailed history of this litigation, and of the underlying administrative proceedings that led to it, is set out in the cases cited. As the issue to be decided is a pure question of law, we need only summarize the salient facts.
 
 
 4
 The matter began in 1990 when Commerce undertook an antidumping administrative review of various imported antifriction bearings, including the bearings at issue in this case. It came to a head when, in June 1993, Commerce filed with the Court of International Trade its "Final Results of Redetermination Pursuant to Court Remand" (Remand Results). In the Remand Results, Commerce detailed its use of the methodology challenged before this court. The issue on appeal is whether the Court of International Trade correctly concluded that Commerce's methodology is impermissible as a matter of law.
 
 
 5
 This is not the first time the process by which adjustment for Home Market (HM) taxes is made in antidumping cases has been before this court. Two recent cases have dealt with related aspects of the problem: Zenith Electronics Corp. v. United States, 988 F.2d 1573, --- Fed.Cir. (T) ---- (1993) (Zenith II ), and Daewoo Electronics Co., Ltd., v. International Union of Electronic, Electrical, Technical, Salaried & Mach. Workers, AFL-CIO, 6 F.3d 1511, --- Fed.Cir. (T) ---- (1993) (Daewoo ). These cases and their significance to the matter before us will be considered below.
 
 
 6
 In order to put the issue in context, we provide, as we did in Zenith II and borrowing from that case, a brief overview of the antidumping law and its method of administration. To protect domestic industries from unfair competition by imported products, United States law imposes a duty on dumped goods, that is, goods sold in this country at a price lower than they sell for in their home market.[1] The duty is equal to the excess of the "Foreign Market Value" (FMV) of the imported merchandise over its "United States Price" (USP). This excess is known as the dumping margin; in effect, the duty corrects for the dumping margin. See "Imposition of antidumping duties," 19 U.S.C. Sec. 1673 (1988); see generally Pattison, supra n. 1.
 
 
 7
 Commerce determines whether dumping has occurred and, if so, how wide the margin is, and therefore how much the duty, by comparing FMV with USP. The key issue, then, in a dumping dispute is the calculation of FMV and USP. If identical or similar goods are sold in the home country by the manufacturer in the ordinary course of trade, establishing FMV is relatively straightforward. If not, Commerce may construct FMV based on available information. See 19 U.S.C. Sec. 1677b(a)(2), 1677b(e).
 
 
 8
 The United States Price, USP, is based on either the purchase price or the exporter's sales price, as the case may be. The statute defines the term "purchase price" to mean "the price at which merchandise is purchased, or agreed to be purchased, prior to the date of importation, from a reseller or the manufacturer or producer of the merchandise for exportation to the United States." 19 U.S.C. 1677a(b) (1988). The term "exporter's sales price" is defined as "the price at which merchandise is sold or agreed to be sold in the United States, before or after the time of importation...." 19 U.S.C. Sec. 1677a(c). In either case, various adjustments may be made in order to determine USP, and therein hangs the tale.
 
 
 9
 In this case, involving bearings made in Japan and imported into and sold in the United States, the Japanese government imposes value added taxes (VAT) on antifriction bearings that are manufactured and sold in Japan, but does not impose VAT on such bearings when they are exported to the United States. Thus Japanese goods sold in Japan are more expensive, by the amount of the VAT, than the same goods sold for export to the United States. Assuming the HM price absent the tax was identical to the export price, with the tax the bearings sell for less on import into this country than they sell for (with the tax added) in their home market. Unless adjustment is made for the tax, this difference in price creates a dumping margin. Furthermore, if a dumping margin exists independent of the tax, for reasons we shall explain, the tax can cause a disproportionate increase in the size of the dumping margin.
 
 
 10
 In principle, however, a difference in sales price due to taxes imposed in the foreign market but not on exports does not constitute unfair pricing behavior. It is a difference created by forces outside the control of the competitor, and does not involve the idea behind the antidumping act: "to prevent foreigners from 'dumping' on this country their surplus products at a price lower than they sell in their country, so as to unfairly compete with us." Anti-Dumping Legislation: Hearings on H.R. 9983 and H.R. 10071 Before the House Committee on Ways and Means, 66th Cong., 1st Sess. at 16 (1919) (statement of Congressman Kitchin).
 
 
 11
 Consequently, Congress provided that when Commerce calculates dumping margins, the Agency shall take into account the impact of such taxes. Section 772 of the Tariff Act of 1930 (the Act), codified as amended at 19 U.S.C. Sec. 1677a(d) (1988), specifically provides:
 
 
 12
 (d) Adjustments to purchase price and exporter's sales price
 
 
 13
 The purchase price and the exporter's sales price shall be adjusted by being--
 
 
 14
 (1) increased by--
 
 
 15
 (A) [the cost of containers and other expenses incident to packing the goods for shipment to the U.S.]
 
 
 16
 (B) [import duties imposed but rebated by the country of exportation]
 
 
 17
 (C) the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States, but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation[.]
 
 
 18
 Subparagraph (C) is the adjustment at issue here. There are at least three ways Commerce could make the adjustment called for by subparagraph (C). The simplest, and clearly tax-neutral, way would be to exclude the taxes from the dumping analysis by not including them in the FMV. In effect, this means subtracting the VAT from the price actually paid in the home market. Commerce applied this approach to the problem in a number of cases. See Zenith Electronics Corp. v. United States, 633 F.Supp. 1382, 1386 and n. 8 (Ct. Int'l Trade 1986) (Zenith I ), appeal dismissed, 875 F.2d 291 (Fed.Cir.1989).
 
 
 19
 However, the way Congress wrote Sec. 772(d)(1)(C) of the Act makes it appear that the adjustment must be made by addition to the other side of the equation, increasing the USP of the merchandise being sold for export, rather than by reduction in the FMV. That was the conclusion reached by the Court of International Trade in Zenith I, 633 F.Supp. at 1394.
 
 
 20
 Thereafter Commerce made the adjustment by addition to USP. But this method of making the adjustment encountered a problem. If the tax is calculated as a rate, the application of the rate to the export price can create a dumping margin that is larger than the actual difference calculated by simply excluding the tax from FMV. In other words, the adjustment now is not tax-neutral. A simple example will illustrate:
 
 
 21
 Assume product A is sold in Japan for $100. The identical product is exported and sold in the U.S. for $90. The difference is $10, the amount by which the product is being dumped. Further assume a 10% VAT is imposed on the sale in Japan, but not on the export sale to the U.S. With the tax included, FMV is $100 + 10% = $110. The similar calculation of USP, using the tax rate, is $90 + 10% = $99. The dumping margin, FMV--USP, is $11 ($110 - 99), rather than the $10 which is the actual amount of dumping. This mathematical peculiarity is known as the "multiplier effect."
 
 
 22
 Commerce's policy was to achieve tax neutrality. This required that appropriate adjustments be made in order to eliminate in so far as possible the multiplier effect. Commerce corrected for the multiplier effect by invoking its authority to make further adjustments under another section of the Act, known as the "circumstances-of-sale" provision, 19 U.S.C. Sec. 1677b(a)(4). In Zenith II this court, affirming a decision of the Court of International Trade, held these additional adjustments, needed to neutralize the tax calculations, were not the kind of adjustments Congress intended under the circumstances-of-sale provision, and thus Commerce could not make the adjustments in that manner. Zenith II, 988 F.2d at 1582.
 
 
 23
 Commerce, still in pursuit of tax neutrality, responded by again changing its adjustment methodology. Instead of using the tax rate to calculate the addition to purchase price, with its inherent multiplier effect, Commerce simply took the tax amount paid in the home market for the same merchandise and added that amount to the price actually paid in the United States. This had the same effect as if Commerce had subtracted the tax from the HM price, and thus resulted in an essentially tax-neutral treatment of the VAT. Plaintiffs in this case object to this methodology; the Court of International Trade agreed with them. Defendants support Commerce's methodology, and appeal the contrary decision of the Court of International Trade.[2]
 
 DISCUSSION
 1.
 
 24
 Buried in the language of statute and case law, and obscured by the fog of litigation, is a simple policy issue: whether Congress, in the Tariff Act of 1930 (the Act), precluded Commerce from determining dumping margins in a tax-neutral fashion. Commerce has twice determined the dumping margin with regard to these bearings in what it calculated was a tax-neutral fashion; Commerce has twice been instructed by the Court of International Trade that its determinations contravene the Act.
 
 
 25
 As we explained, dumping margins are defined by the difference between FMV and USP. In this case, HM sales were reported exclusive of VAT. Commerce therefore had to add some amount, representing the VAT, to the HM sales in order to determine FMV. In its first determination, Commerce added the same VAT amount to FMV as that calculated for USP. This was deemed equivalent to calculating the actual HM tax, and then performing a circumstance-of-sale adjustment to FMV to eliminate the absolute difference between the amount of tax in each market. Administrative Results, 56 Fed.Reg. at 31,729. This methodology was rejected by the Court of International Trade on the grounds that Sec. 1677a(d)(1)(C) requires that USP be increased by the amount of any indirect tax imposed regardless of whether FMV is reported net tax or not. Federal-Mogul I, 813 F.Supp. at 860. The matter was remanded to the Agency for reexamination of the methodology.
 
 
 26
 In its second determination, Commerce added the actual VAT paid on similar goods in Japan to the HM sales (in order to get total FMV), and then added the same amount to the USP. In both its first and second determinations of the dumping margin, Commerce used the same amount to represent VAT in its calculation of FMV and USP, thereby leaving unaffected the absolute difference between the FMV and USP absent the tax. Both determinations were thus tax neutral, i.e., the Japanese VAT did not affect the dumping margin.[3] Again, however, the Court of International Trade disapproved. Federal-Mogul II, 834 F.Supp. 1391.
 
 
 27
 The Court of International Trade concluded that both the language of the statute and controlling precedent mandated against Commerce's new methodology. Much discussion in the opinion of the Court of International Trade, as well as in the briefs on appeal, was devoted to the significance of certain statements in this court's opinion in Zenith II, and particularly to footnote 4 of that opinion. Reliance on various passing observations not necessary to a decision is misplaced. The issue in Zenith II was not how Commerce should go about adjusting for foreign taxes, but whether the practice of justifying certain kinds of adjustments under the rubric of the 'circumstances-of-sale' provision was proper. The court held such reliance was not justified. We did not instruct Commerce how to make the adjustments, only how not to make them.
 
 
 28
 In footnote 4 of the opinion, this court observed that
 
 
 29
 [t]he statute by its express terms allows adjustment of USP in the amount of taxes on the merchandise sold in the country of exportation. While perhaps cumbersome, Commerce may eliminate the multiplier effect by adjusting USP by the amount, instead of the rate, of the ad valorem tax.
 
 
 30
 Zenith II, 988 F.2d at 1582 n. 4. That is precisely what Commerce did in its Final Determination in this case. Even so, plaintiffs are correct that footnote 4 was not addressing a question then before the court, and thus did not resolve the issue whether that is a permissible methodology under the Act.
 
 
 31
 Just as Zenith II does not decide this issue one way, neither does Daewoo decide it the other. The Court of International Trade read this court's opinion in Daewoo to support its holding; we think the case inapposite to the issue at hand. The Korean companies who brought Daewoo to this court challenged Commerce in its choice of the point in the stream of commerce at which to calculate USP, that is, the point at which to multiply a domestic price by a foreign tax rate. This court upheld the Agency's determination. The Court of International Trade reads Daewoo as implicit sanction of the Agency's use of a foreign tax rate, as opposed to the amount of foreign tax, to establish the dumping margin. Even if that reading of Daewoo can be sustained, it does not resolve this case. To permit is not to require. At no point in Daewoo, or anywhere else, have we held that the Act requires Commerce to use foreign tax rates, rather than amounts of tax, to determine dumping margins. That is the issue now before us.
 
 
 32
 Plaintiffs, who support the Court of International Trade's decision, argue that in calculating the USP, the Act requires Commerce to figure USP by adding the amount of tax that the United States government would obtain if it imposed VAT--at the same rate and in the same manner as the Japanese government did on bearings sold in Japan--on the Japanese bearings sold in the United States. At the same time, say plaintiffs, in order to calculate the foreign market value of the goods, the Act requires Commerce to use the actual VAT paid on the same or similar goods in the home market. This methodology produces different amounts of tax for FMV and for USP, and thus is not tax neutral.
 
 
 33
 Plaintiffs argue that the statute mandates the interpretation they support, that is, that the tax is related to the price at which the article is sold, and that therefore only a rate-calculated tax makes sense. And if that is so, then the rate must be imposed on the price for which the goods are sold in the respective markets. This is not an unreasonable position. The statute talks about "taxes imposed ... upon the exported merchandise ... which have not been collected, by reason of the exportation of the merchandise to the United States...." 19 U.S.C. Sec. 1677a(d)(1)(C). The statute can be read to mean that USP must include that amount of taxes that would be paid if the tax rate were applied to the purchase price of the goods actually imported into this country, regardless of the tax that would have been paid if the same goods were sold in the home market at the home market price.
 
 
 34
 On the other hand, the statute states that the USP is to be increased by "the amount of any taxes imposed in the country of exportation," and includes taxes "which have been rebated," in addition to those "which have not been collected." Id. (emphasis added). A rebated tax presumably is one that has been levied in the country of origin, and presumably was levied on the basis of the selling price in the home market. If it is that amount that is to be added to USP, then the statute would be consistent with Commerce's new methodology of using the tax amount that would be paid in the home market as the additur to USP.
 
 
 35
 The legislative history of this section of the Act makes it clear that Congress intended the adjustment to be made to USP, and not to FMV. The proposal by the House of Representatives to exclude excise taxes from FMV was rejected by the House-Senate Conference Committee in favor of the Senate's version, which defined FMV to include these taxes, but allowed for upward adjustment to USP. See 61 Cong.Rec. 254 (1921); S.Rep. No. 16, 67th Cong., 1st. Sess. 2-3 (1921). See also Zenith II, 988 F.2d at 1580. That history, however, does not tell us what Congress had in mind for how the adjustment was to be made, and specifically it does not tell us that Congress intended to preclude Commerce from making the adjustment tax-neutral.[4]
 
 
 36
 Certainly the rejected approach proposed by the House called for a tax-neutral process. Had Congress simply left the matter there, it could be argued forcefully that dumping margins were not to be tax-neutral. In adopting the Senate's approach, an approach that is not inherently tax-neutral, Congress nevertheless provided for adjustment for taxes. It can be inferred from this that Congress did not mandate a tax-neutral approach; it cannot be inferred that Congress mandated the opposite, however.
 
 
 37
 We are faced, then, with the classic problem of a statute which does not answer the question posed, and which contains language that could be read to support alternative competing views of what was intended. In this case, the Court of International Trade disagreed with the Agency's reading, and we are compelled to choose between them. As we have demonstrated, neither our precedents nor the statute dictates the result.
 
 
 38
 Plaintiffs vigorously attack defendants' efforts to persuade us that the Agency's decision is entitled to deference. Plaintiffs recite the uneven history of Commerce's approach to this problem, and argue that there is nothing to which to defer. They point to the fact that Commerce's approaches have been found unlawful in prior decisions of this court and the Court of International Trade. Plaintiffs further argue that Commerce is not entitled to Chevron deference. See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (holding that, in the context of agency rulemaking, and assuming the statute is silent or ambiguous, courts should defer to agency understanding of the statute pursuant to which the agency promulgates regulations). See generally Maureen B. Callahan, "Must Federal Courts Defer To Agency Interpretations of Statutes?: A New Doctrinal Basis For Chevron, U.S.A. v. Natural Resources Defense Council," 1991 Wis.L.Rev. 1275. Plaintiffs contend that the Act leaves no room for doubt as to its meaning, and even if it did, Commerce's interpretation could not be deemed a reasonable one. Finally, plaintiffs argue, Commerce's methodology was not based on its use of its expertise in administering the Act, but on a misplaced reliance on language in Zenith II.
 
 
 39
 The question of whether, and to what extent, the Agency's approach to this problem is entitled to deference is not lightly decided. For one, Chevron deference is a limited relinquishment of judicial power to declare what the law is. It is available when Congress leaves to an agency the choice of a course to follow in pursuit of a Congressional purpose, embodied in a statute, and the agency has issued regulations or taken other considered and official action, declaring that course. If the course the agency has chosen is reasonable, that is, a permissible one under the law, courts do not exercise their usual power to declare what the law is. The agency is entitled in such circumstances to make that decision. That is what Chevron teaches.
 
 
 40
 Chevron constitutes a significant inroad into traditional judicial power, and is not lightly to be applied to just any agency decision or litigation position made on behalf of an agency. However, to conclude that a particular situation does not call for Chevron deference does not mean that an agency's decision is entitled to no deference whatsoever. Under the Administrative Procedure Act (APA), agency decisions are entitled to considerable deference. With regard to fact finding, the APA makes substantial evidence in the record sufficient to support an agency's finding, even if a preponderance of the evidence is opposed to it. 5 U.S.C. Sec. 706 (1988). More generally, agency determinations are to be upheld unless they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Id. The agency's application of a statute's terms to the facts of a particular case has been accorded considerable deference if application requires the agency's expertise. See, generally, Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); NLRB v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944).
 
 
 41
 In this case, there may be some question whether Commerce's new methodology is entitled to Chevron deference. The record is less than clear about the manner in which the new methodology was announced, and whether the new methodology was adopted as a considered policy for all future cases of this kind and as Commerce's understanding of its responsibilities under the Act, or whether it was a more ad hoc decision just for this case. There is material in the record to suggest that Commerce was generally applying the new methodology until it was judicially ordered not to, but there is also material suggesting that it had tried and abandoned this approach at an earlier time. The fact that Commerce has chosen not to be a party to this appeal leaves us with some question about its current posture.
 
 
 42
 Be that as it may, one thing is clear from the record: in administering the Act, the Agency over the years has pursued a policy of attempting to make the tax adjustment called for by the Act tax-neutral. We conclude that Commerce's long-standing policy of attempting tax-neutrality in its administration of this provision is not precluded by the language of Sec. 1677a, nor do we find the particular proposed methodology to be an unreasonable way to pursue that policy in light of the statutory language.
 
 
 43
 It is well established that antidumping law is not intended to be punitive. Antidumping jurisprudence seeks to be fair, rather than to build bias into the calculation of dumping margins. Melamine Chemicals v. United States, 732 F.2d 924, 933, 2 Fed.Cir. (T) 57, 68 (1984); NAR, S.p.A. v. United States, 707 F.Supp. 553, 558 (Ct.Int'l Trade 1989); Badger-Powhatan v. United States, 608 F.Supp. 653, 656 (Ct.Int'l Trade 1985). It is important to remember that dumping is defined in terms of sales below FMV. It has nothing to do with a foreign government's tax policy; taxes that prejudice trade present another matter altogether, which Congress has addressed by providing for countervailing duties. Either foreign governments or foreign companies may engage in price discrimination, and Congress has established separate duties to remedy each sort of price discrimination. The method for adjusting the tax impact urged by plaintiffs improperly conflates two sorts of price discrimination.
 
 
 44
 The law of countervailing duties nevertheless provides some apt analogies. The case of Zenith Radio Corp. v. United States, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978) (Zenith Radio ), also involved a Japanese commodity tax. Unanimously affirming a decision by our predecessor court, the Court of Customs and Patent Appeals, that reversed the Customs Court, the Supreme Court held that remission of the taxes on goods exported did not constitute a subsidy. The Secretary of the Treasury was therefore correct in determining that imposition of countervailing duties was inappropriate. Zenith Radio presented much the same issue, in terms of countervailing duty law, as the case before us presents in terms of antidumping law. We see no reason that the rationale of Zenith Radio is not applicable to this case.
 
 
 45
 Defendants plausibly argue that the reading of the Act urged by plaintiffs is in direct conflict with obligations arising under the General Agreement on Tariffs and Trade (GATT). The GATT itself provides that:
 
 
 46
 4. No product of the territory of any contracting party imported into the territory of any other contracting party shall be subject to antidumping or countervailing duty by reason of the exemption of such product from duties or taxes borne by the like product when destined for consumption in the country of origin or exportation, or by reason of the refund of such duties or taxes.
 
 
 47
 General Agreement on Tariffs and Trade, art. VI(4), October 30, 1947, 61 Stat. pt. 5, 24 (1948).
 
 
 48
 Subsequent agreements implementing the GATT have maintained the policy of tax neutrality. The Antidumping Code provides:6. In order to effect a fair comparison between the export price and the domestic price in the exporting country.... Due allowance shall be made in each case, on its merits, for the differences in conditions and terms of sale, for the differences in taxation, and for the other differences affecting price comparability.
 
 
 49
 Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1979, art. 2.6, April 12, 1979, 31 U.S.T. 4919, 4926 (1981) (emphasis added). The Uruguay Round Antidumping Code is similar:
 
 
 50
 Due allowance shall be made in each case, on its merits, for differences which affect price comparability, including differences in conditions and terms of sale, taxation, ... and any other differences which are also demonstrated to affect price comparability.
 
 
 51
 Final Act Embodying the Results of the Uruguay Round of Multilateral Trade Negotiations, Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994, art. 2.4, 15 April 1994, H.R. Doc. No. 316, 103d Cong., 2d Sess. 1455 (footnote omitted, emphasis added). The GATT thus seems to stand squarely behind the proposition that antidumping duties are not to take account of tax differences.
 
 
 52
 Since this case was argued, the Uruguay Round Agreements have been incorporated into United States law by the Uruguay Round Agreements Act, Sec. 101, 108 Stat. 4808, 4814-15. It remains true, however, that in the event of a conflict between a GATT obligation and a statute, the statute must prevail. Id. Sec. 102, 108 Stat. 4815-16; see also 19 U.S.C. Sec. 2504(a) (1988); Suramerica de Aleaciones Laminadas, C.A. v. United States, 966 F.2d 660, 668, --- Fed.Cir. (T) ----, ---- (1992). Therefore, the GATT does not necessarily preclude plaintiffs' position.
 
 
 53
 Yet GATT agreements are international obligations, and absent express Congressional language to the contrary, statutes should not be interpreted to conflict with international obligations. The Supreme Court's classic expression of this canon of construction is particularly apt in this case:
 
 
 54
 It has also been observed that an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains, and consequently can never be construed to violate neutral rights, or to affect neutral commerce, further than is warranted by the law of nations as understood in this country.
 
 
 55
 These principles are believed to be correct, and they ought to be kept in view in construing the act now under consideration.
 
 
 56
 Alexander Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch.) 64, 118, 2 L.Ed. 208 (1804) (emphasis added). See also Fundicao Tupy S.A. v. United States, 652 F.Supp. 1538, 1543 (Ct.Int'l Trade 1987) ("An interpretation and application of the statute which would conflict with the GATT Codes would clearly violate the intent of Congress."); Proceedings of the Eighth Judicial Conference of the United States Court of International Trade, 149 F.R.D. 245, 257-73 (1992) (discussing relationship between GATT and statutes in United States courts).
 
 
 57
 Trade policy is an increasingly important aspect of foreign policy, an area in which the executive branch is traditionally accorded considerable deference. This is not to say that Commerce has unlimited discretion over antidumping margin determinations, or that courts will unthinkingly defer to the Government's view of Congressional enactments. Antidumping duties are not simply tools to be deployed or withheld in the conduct of domestic or foreign policy. In particular, the independent status of the International Trade Commission was intended to insulate the Government's decision to impose antidumping duties from narrowly political concerns.
 
 
 58
 In this case, however, the Act presented Commerce with a choice between methodologies for calculating dumping margins that are tax-neutral, on the one hand, and methodologies that are not tax-neutral, on the other. Tax-neutral methodologies clearly accord with international economic understandings, negotiated by this country, regarding fair trade policy. Plaintiffs argue, and the Court of International Trade held, that Commerce had a duty to choose the methodology that violates those understandings. Commerce is due judicial deference in part because of its established expertise in administration of the Act, and in part because of "the foreign policy repercussions of a dumping determination." Smith-Corona Group, Consumer Products Div., SCM Corp. v. United States, 713 F.2d 1568, 1571, 1 Fed.Cir. (T) 130, 131 (1983), cert. denied, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). For the Court of International Trade to read a GATT violation into the statute, over Commerce's objection, may commingle powers best kept separate.
 
 SUMMARY
 
 59
 We find Commerce's interpretation of the Act to be within the terms of the statute, and not in conflict with any precedents of this court or the Supreme Court. Commerce's understanding of its duty under the Act, as well as under our international agreements, and the expertise it brings to the administration of the Act, lends support to the position it has taken. Under the circumstances we see no grounds upon which this court or the Court of International Trade should impose a different view of the Agency's duty.
 
 CONCLUSION
 
 60
 The judgment of the Court of International Trade is reversed. The matter is remanded for further proceedings in accordance with this opinion, including an opportunity for Commerce to inform the court whether it wishes to continue utilizing the tax-neutral methodology employed in its Final Determination.
 
 REVERSED AND REMANDED
 
 61
 MAYER, Circuit Judge, dissenting.
 
 
 62
 The issue--whether the Court of International Trade correctly concluded that the Department of Commerce's methodology is impermissible as a matter of law--will not arise again in its present form. Following the Uruguay Round of GATT, the statute was amended, and the subsection at issue no longer exists. See Pub.L. No. 103-465, Title II, Sec. 223, 108 Stat. 4876 (1994). Moreover, Commerce had apparently changed its practice to conform to the Court of International Trade's decision prior to the filing of this appeal. Nevertheless, I dissent because the statute as then written was unambiguous and required the tax rate to be applied to the United States price. I would therefore affirm.
 
 
 63
 The statute makes clear that Commerce may not make the adjustment to USP for forgiven taxes by adding the amount of taxes actually paid on home market sales. As this court has previously stated, section 1677a(d)(1)(C) unambiguously requires "Commerce to increase USP by the amount of tax that the exporting country would have assessed on the merchandise if it had been sold in the home market." Zenith Elecs. Corp. v. United States, 988 F.2d 1573, 1580 (Fed.Cir.1993). Any other approach would depart from the statute's explicit requirements. Commerce's and this court's constant iteration of the tax neutrality theme does not alter that fact.
 
 
 64
 Because the statute is clear on its face, I do not see any need to reach the question of whether the agency's approach is entitled to Chevron deference. See Ad Hoc Comm. v. United States, 13 F.3d 398, 402 (Fed.Cir.1994) ("Under Chevron and its progeny ... courts do not consider the reasonableness of an agency's interpretation of a statute unless the relevant statute is silent or ambiguous on the question at hand." (citation omitted)). Nor is Commerce's expertise entitled to any special weight here. Commerce may have a longstanding policy of attempting to achieve tax neutrality, but this policy has only led to experimentation with ways to avoid the clear mandate of the statute. If Congress had held tax neutrality paramount, which is by no means clear even in the legislative history, there were ways to draft the statute to achieve that result. See Zenith, 988 F.2d at 1582 (noting that Congress rejected a proposal that would have resulted in tax neutral treatment). For example, as the court points out, the statute could have required Commerce to subtract the taxes from the FMV. However, when this court held that such a method and others attempted by Commerce over the years, such as making adjustments through the "circumstances of sale" provision of section 1677b(a)(4), find no support in the statute, we noted that the statute as written simply does not prevent the "multiplier effect." See Zenith, 988 F.2d at 1581-82. If the amount of tax forgiven on exports that is added to USP is less than the amount of tax paid on home market sales, this is due to the operation of the antidumping law as intentionally written by Congress. See id. at 1581. Thus, I would not disturb the Court of International Trade's conclusion that Commerce's methodology was impermissible as a matter of law.
 
 
 
 [1]
 "While several different definitions have been used through the years by various observers, dumping, as used in contemporary legal frameworks, in essence consists of selling a commodity from one country to a different country under similar conditions of sale for less than its price in its own country." Joseph E. Pattison, Antidumping and Countervailing Duty Laws, Sec. 1.02 (1994)
 
 
 [2]
 Commerce, one of the defendants below, did not join in the appeal
 
 
 [3]
 Similarly, Commerce has recognized that determining dumping margins requires careful treatment of tax in order to avoid creating an apparent dumping margin even though no actual dumping has occurred. See, e.g., Ferrosilicon From Brazil, 59 Fed.Reg. 732, 733 (Dep't Commerce 1994) ("These adjustments ... are necessary to prevent the new methodology for calculating the USP tax adjustment from creating antidumping duty margins where no margins would exist if no taxes were levied upon foreign market sales."); Certain Stainless Steel Butt-Weld Pipe and Tube Fittings From Japan, 59 Fed.Reg. 740 (Dep't Commerce 1994) (same); Certain Stainless Steel Wire Rods From France, 58 Fed.Reg. 68,865, 68,867 (Dep't Commerce 1993) ("By making this additional tax adjustment, we avoid a distortion that would cause the creation of a dumping margin even when pre-tax dumping is zero.")
 
 
 [4]
 The American Association of Exporters and Importers, amicus curiae in this case, maintains that the legislative history shows only that Congress never thought about the precise issue at bar