CAMARGO CORREA METAIS, S.A., PLAINTIFF *v.* UNITED STATES, DEFENDANT, AND AMERICAN ALLOYS, INC., GLOBE METALLURGICAL, INC., AMERICAN SILICON TECHNOLOGIES (FORMERLY SILICON METALTECH, INC.), AND SIMETCO, INC., DEFENDANT-INTERVENORS

Consolidated Court No. 91–09–00641

(Dated November 25, 1997)

*Rogers & Wells (William Silverman and Ryan Trainer)* for plaintiff Camargo Correa Metais, S.A.

*Law Offices of Royal Daniel, III (Royal Daniel, III and Jeri Beth Katz)* for plaintiffs Companhia Brasiliera Carbureto De Calcio, Rima Eletrometalurgica, S.A., and Ligas de Aluminio, S.A.

*Frank W. Hunger,* Assistant Attorney General; *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice *(Jeffrey Telep and Reginald T. Blades, Jr.);* of counsel: *Rebecca Rejtman,* Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for defendant.

*Baker & Botts (William D. Kramer, Charles M. Darling, IV, and Martin Schaefermeier)* for defendant-intervenors.

## OPINION

MUSGRAVE, *Senior Judge:* This case arises from an affirmative anti-dumping duty determination conducted by the U.S. Department of Commerce, International Trade Administration ("Commerce" or "ITA"), and published in the *Final Determination of Sales at Less Than Fair Value: Silicon Metal from Brazil,* 56 Fed. Reg. 26,977 (1991) ("Final Determination"). Plaintiffs Camargo Correa Metais, S.A. ("CCM"), Companhia Brasiliera Carbureto De Calcio ("CBCC"), Rima Eletrometalurgia, S.A., and Ligas De Aluminio S.A., Brazilian producers of silicon metals who export their product into U.S. markets, challenged the Final Determination in a consolidated action. *Camargo Correa Metais, S.A. v. United States, et al.,* 17 CIT 897 (1993) *("Camargo I").*

## BACKGROUND

In *Camargo I,* this Court reviewed the ITA's determination of dumping margins with respect to each plaintiff and affirmed the Final Determination in part but also remanded three issues for further consideration. *Id.* at 911. After receiving comments from the parties on its preliminary remand results, the ITA presented this Court with its Final Results of Redetermination Pursuant to Court Remand (Dec. 13, 1993) ("Final Remand Results"). This Court, believing that the parties had no objections to the Final Remand Results, issued a judgment, with-

out opinion, affirming the Final Remand Results in all respects. *Camargo Correa Metais, S.A. v. United States, et al.*, 18 CIT 330 (1994) *("Judgment")*. Defendant-intervenors, U.S. manufacturers of silicon metal, appealed, and the Court of Appeals for the Federal Circuit ("CAFC") vacated this Court's *Judgment* and remanded the case to this Court. *Camargo Correa Metais, S.A. v. United States, et al.*, 13 Fed. Cir. (T) ___, 52 F.3d 1040 (1995) *("Camargo II")*. The CAFC held that the *Judgment* alone, which affirmed the Final Remand Results without an explanation of the Court's findings or conclusions, was an insufficient record to "provide effective and meaningful appellate review." *Id.*, 13 Fed. Cir. (T) at ___, 52 F.3d at 1043. The CAFC ordered this Court to provide a decision containing "a statement of findings of fact and conclusions of law" or "an opinion stating the reasons and facts upon which the decision is based." *Id.* (citing 28 U.S.C. § 2645(a) (1988)). The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) (1994), and affirms Commerce's Final Remand Results in part and remands in part.

### Standard of Review

In reviewing antidumping determinations, the Court "shall hold unlawful any determination, finding, or conclusion found * * * to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Under this standard, the Court must first determine whether the agency, in its methodology, has given proper effect to the statute that it is charged with administering. The Court will "evaluate for reasonableness the way in which [an agency] chose to interpret" the statute it is applying. *Micron Technology, Inc. v. United States*, 15 Fed. Cir. (T) ___, ___, 117 F.3d 1386, 1396 (1997); *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S. Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1983). "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Ceramica Regiomantana, S.A. v. United States*, 10 CIT 399, 404–05, 636 F. Supp. 961, 966 (1986), *aff'd*, 5 Fed. Cir. (T) 77, 810 F.2d 1137 (1987) (citations omitted). The Court must then determine whether the agency's determinations or conclusions are supported by substantial evidence, which "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S. Ct. 456, 459, 95 L.Ed. 456 (1951) (citations omitted). "[Substantial evidence] is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620, 86 S. Ct. 1018, 1026, 16

L.Ed.2d 131 (1966) (citations omitted). The Court will "sustain [an agency's] determination if it is reasonable and supported by the record as a whole, including whatever fairly detracts from the substantiality of the evidence." *Negev Phosphates, Ltd. v. United States*, 12 CIT 1074, 1077, 699 F. Supp. 938, 942 (1988) (citations omitted).

## DISCUSSION

In *Camargo I*, this Court affirmed in part and remanded in part a final affirmative antidumping duty determination of exports of silicon metal from Brazil. The ITA determined that the Brazilian producers, the plaintiffs in this case, were exporting silicon metal to the U.S. where it was sold at less than fair value. In a review complicated by extreme hyperinflation in Brazil, the ITA used constructed value ("CV") to establish foreign market value ("FMV") for comparison with the United States price ("USP"), because CCM's and CBCC's home market sales were found to be at less than the cost of production ("COP"). *Final Determination of Sales at Less Than Fair Value: Silicon Metal from Brazil*, 56 Fed. Reg. at 26,979. The controversy in the case centered upon the ITA's calculation of COP and CV. *Camargo Correa Metais, S.A.*, 17 CIT at 898. This Court found the ITA's determinations to be reasonable, supported by substantial evidence, and in accordance with law, and affirmed the Final Determination on all but three issues. *Id.* at 911.

The Court questioned three areas of the Final Determination: (1) a circumstances of sale adjustment to the FMV calculation for plaintiff CBCC; (2) an unsatisfactory explanation regarding the ITA's allocation of general, sales and administrative ("GS&A") expenses to its COP calculation for plaintiff CCM; and (3) the ITA's treatment of Brazil's value added taxes ("ICMS" or "VAT") with regard to CCM's home market sales price and COP, and the potential "double counting" of the ICMS with regard to CBCC's CV and USP. *Id.* at 903, 905, 908–10. The Court ordered the ITA to reconsider these issues, stating:

> On remand, the ITA is instructed to reexamine the circumstances of sale adjustment for letter of credit sales and explain why such sales constitute a *bona fide* difference in the circumstances of domestic sales. The ITA is further directed to explain in greater detail its allocation of annual GS&A expenses to the merchandise produced during the period of investigation, and change said allocation if it systematically overstates GS&A expenses. The ITA shall announce a method and rationale for complying with 19 U.S.C. §§ 1677a(d)(1)(C) and 1677b(e)(1)(A) that avoids double counting. The method and rationale for complying with 19 U.S.C. §§ 1677a(d)(1)(C) and 1677b(e)(1)(A) shall account for the economic reality that ICMS that is paid on inputs to export production, and recovered from taxes otherwise due the Brazilian government, is not a cost of producing silicon metal for export in Brazil.

*Id.* at 911.

The ITA responded by issuing Preliminary Results on Remand, *Camargo Correa Metais, S.A. v. United States* (August 12, 1993) ("Prelimi-

nary Remand Results") and Final Remand Results. For the reasons which follow, the ITA's Final Remand Results are affirmed in part and remanded in part.

### I. THE CIRCUMSTANCES OF SALE ADJUSTMENT.

The ITA determines whether a product imported into the United States is being sold at less than fair value by engaging in a comparison of the product's value in its home market—its foreign market value (FMV)—with the product's sales value in the United States—the U.S. price (USP). 19 U.S.C. § 1673 (1988); see also Staff of House Comm. on Ways and Means, 104th Cong., 1st Sess., Overview and Compilation of U.S. Trade Statutes 63–67 (Comm. Print 1995). The ITA establishes and imposes upon the exporter of the product a dumping margin equal to the amount by which the product's FMV exceeds the USP. 19 U.S.C. § 1673 (1988).

The ITA is permitted to adjust the FMV calculation for conditions, or an absence of conditions, in the home market which would account for a *bona fide* difference between FMV and USP; this is known as a circumstances of sale adjustment. 19 U.S.C. § 1677b(a)(4)(B) (1988); 19 C.F.R. § 353.56(a) (1991). In its Final Determination, the ITA made a circumstances of sale adjustment to its calculation of FMV for plaintiff CBCC. "The ITA imputed credit expenses to CBCC for sales made utilizing a letter of credit for the period between the date of shipment and the date payment was received by CBCC." *Camargo Correa Metais, S.A.*, 17 CIT at 903. That is, in CBCC's home market, payment was made prior to or concurrent with shipment, resulting in no outstanding receivables. On its sales to the U.S., however, CBCC did not receive payment until after shipment. The financing costs CBCC incurred during the interim period between shipment and receipt of payment were imputed to FMV and the dumping margin determination. *Id.*; *Final Determination of Sales at Less Than Fair Value: Silicon Metal from Brazil*, 56 Fed. Reg. at 26,981.

This Court found that the ITA's circumstances of sale adjustments were supported by the record for the majority of CBCC's letter of credit transactions. *Camargo Correa Metais, S.A.*, 17 CIT at 903. However, the ITA made adjustments for expenses incurred on some sales where there was a delay of only a few days between shipment of and payment for the goods. The Court remanded this issue to the ITA "to explain why a difference of as little as three days constitutes a *bona fide* difference in the circumstances of these sales." *Id.*

On remand, the ITA explained that even the very short periods of time in this case[1] result in a significant difference in dumping margins and a corresponding amount of potentially uncollected dumping duty. The ITA measured the actual period during which payment was outstanding

---

[1] The ITA noted and the record confirms that the shortest time delay between shipment and receipt of payment was six days, not three as discussed in *Camargo I*. "[F]or all of its U.S. sales, CBCC received payment *after* shipment" and "the credit periods ranged from six days to 57 days." Preliminary Remand Results at 2 (emphasis in original).

for both letter of credit transactions and "at sight" sales to the U.S.[2] As to the letter of credit transactions, the ITA found that "if Commerce had not adjusted for this circumstance of sale, the dumping margin on this sale would have dropped from 76.58 percent to 76.37 percent" and "the amount of the potentially uncollected dumping duty [ ] for this transaction would drop from $841,543.73 to $839,193.62, a difference of $2,350.11." Preliminary Remand Results at 3 (Nov. 3, 1993). The ITA further found that in the absence of an adjustment for the "at sight" sales, "the overall dumping margin and [potentially uncollected dumping duty] would drop from 87.79 percent to 87.62 percent, and $4,389,304 to $4,381,049, respectively." Preliminary Remand Results at 3. The ITA asserts that a *bona fide* difference in the circumstances of sale exists because the ITA is "able to measure the difference, it is real, and [the ITA] know[s] the effect of not adjusting for it." Preliminary Remand Results at 4.

CBCC does not debate the potential difference in dumping margin and duty. CBCC asserts that the ITA should not have made an adjustment for letter of credit sales, because CBCC is not actually extending credit and incurring financing costs. However, in *Camargo I*, the Court found the ITA's adjustment for financing costs to be reasonable and supported by the evidence, and the Court dismissed CBCC's argument.[3] The Court remanded this issue to the ITA only for an explanation of whether a *bona fide* difference in circumstances of sales existed where there was an extremely short time period between shipment and receipt of payment. The ITA's explanation in its Final Remand Results, which incorporates the discussion from its Preliminary Remand Results, satisfies the Court that a *bona fide* difference does exist. The Court finds that the ITA's circumstances of sale adjustment is supported by substantial evidence and is affirmed.

## II. THE CALCULATION OF GS&A EXPENSES.

The Court begins its review of this issue by assessing its authority in this case after remand from the CAFC. In *Camargo II*, the CAFC did not address the merits of any of the lower decisions: *Camargo I*, the Final Remand Determination, or this Court's *Judgment* affirming the Final Remand Determination. Rather, the CAFC remanded the case to this Court with instructions to support its *Judgment* by providing a statement of the findings or an explanation of the conclusions which led the Court to affirm the Final Remand Determination. *Camargo Correa Metais, S.A.*, 13 Fed. Cir. (T) at ____, 52 F.3d at 1043.

---

[2] The ITA found that CBCC experienced a delay in payment, during which it incurred financing costs which should be imputed to FMV, not only on letter of credit transactions, but also on its "at sight" sales to the U.S. Preliminary Remand Results at 2–3.

[3] In *Camargo I*, CBCC argued that it incurred no financing costs because it extended no credit to its buyers in its letter of credit transactions. CBCC stated that the costs associated with the delay between shipment and payment were incorporated in the expenses it incurred for the maintenance of working capital, and that it had already accounted for the expenses between the due date of the letter of credit and the date of remittance from the bank. The record contradicted CBCC, however. The Court found that "CBCC did not have access to the funds to offset its accounts receivable balances until payment was credited to its bank account" and "[t]herefore the credit expense was properly imputed." *Camargo Correa Metais, S A.*, 17 CIT at 903.

After the CAFC remand, this Court granted defendant-intervenors' motion to submit comments on the ITA's Final Remand Results, and entertained replies from CCM and the ITA. CCM contends that the defendant-intervenors' post-remand comments present new arguments not previously considered in an attempt to effect a re-hearing of the case, which CCM asserts is impermissible on the grounds that the Court's jurisdiction is limited to the remand mandate from the CAFC. Defendant-intervenors assert that the CAFC returned full and unrestricted jurisdiction to this Court because the CAFC did not decide any issues, and not only remanded the case but also vacated the *Judgment*.

The Court finds that it has jurisdiction to consider the entire record before it, including the post-remand comments and arguments of the parties. The Court of International Trade ("CIT") is vested "with all the necessary remedial powers in law and equity possessed by other federal courts established under Article III of the Constitution." *Rhone Poulenc, Inc. v. United States*, 7 Fed. Cir. (T) 115, 116, 880 F.2d 401, 402 (Fed. Cir. 1989). The CIT's broad authority is limited to the extent that the CIT, like its sister District Courts,[4] must follow a mandate from its appellate court on issues to which the higher authority has specifically spoken. *See Gindes v. United States*, 740 F.2d 947, 949 (Fed. Cir.), *cert. denied*, 469 U.S. 1074, 105 S. Ct. 569, 83 L.Ed.2d 509 (1984); *In re Sanford Fork and Tool Co.*, 160 U.S. 247, 255, 16 S. Ct. 291, 293, 40 L.Ed. 414 (1895). While the CIT must "refuse to reopen what has been decided,"[5] nothing has been decided in this case; the CAFC did not decide any of the issues involved. *Camargo Correa Metais, S.A.*, 13 Fed. Cir. (T) at ___, 52 F.3d at 1043. The Court notes that the CAFC also vacated the *Judgment*, thereby affording the Court an opportunity to review all information which would support or contradict the Final Remand Results.[6] The Court agrees with defendant-intervenors that "a trial court * * * may consider * * * those issues not expressly or implicitly disposed of by the appellate decision"[7] and finds that it is empowered to consider the entire record before it.

The record now before the Court includes the comments of defendant-intervenors submitted after the issuance of the ITA's Final Remand Results. Defendant-intervenors challenge the ITA's conclusion with respect to the ITA's final allocation of GS&A expenses.[8] CCM and the ITA are both in agreement that the Final Remand Results have appropriately resolved the issue of GS&A expenses.

---

[4] *See* 28 U.S.C. § 1585 (1994) ("The Court of International Trade shall possess all the powers in law and equity of * * * a district court of the United States.")

[5] *Messenger v. Anderson*, 225 U.S. 436, 444, 32 S. Ct. 739, 740, 56 L.Ed. 1152 (1912).

[6] The law of the case doctrine "does not constrain the trial court with respect to issues not actually considered by an appellate court * * * and thus has long been held not to require the trial court to adhere to its own previous rulings if they have not been adopted, explicitly or implicitly, by the appellate court's judgment." *Exxon Corp. v United States*, 931 F.2d 874, 877 (Fed. Cir. 1991) (citing *Holcomb v United States*, 622 F.2d 937, 940 (7th Cir. 1980)).

[7] Def.-Intervenors' Mot. for Leave to Respond at 6 (quoting *Bankers Trust Co. v. Bethlehem Steel Corp.*, 761 F.2d 943, 950 (3rd Cir. 1985)).

[8] Defendant-intervenors also challenge the remand results on the ICMS issue, discussed *infra*, Part III.

The ITA determined that CCM's home market sales were made at prices below its COP, and therefore used monthly constructed values to determine FMV for comparison with USP. *Final Determination of Sales at Less Than Fair Value: Silicon Metal from Brazil*, 56 Fed. Reg. at 26,979. In calculating CV, the ITA included the percentage of the cost of producing silicon metal which was attributable to CCM's GS&A expenses. The ITA establishes the percentage as a ratio characterized by the annual GS&A expenses divided by the annual cost of goods sold ("COS"). *Id.* at 26,985. The ITA will then typically—and originally did in this case—multiply the ratio by the cost of manufacturing ("COM") determined on a replacement, or current, cost basis. "The ITA allocated CCM's annual GS&A expenses by calculating the ratio of annual GS&A expenses to annual cost of sales" and multiplying "this ratio by the monthly COM calculated on a replacement cost basis." *Camargo Correa Metais, S.A.*, 17 CIT at 904.

In *Camargo I*, CCM challenged the ITA's method for allocating annual GS&A expenses to monthly COP. CCM argued that this method would exaggerate or overstate its GS&A expenses because of an improper "apples-to-oranges" comparison: the ITA's ratio used a numerator based on *historical* GS&A and a denominator based on *historical* COS, but the multiplier was based on *current* COM. That is, in an economy experiencing the extreme hyperinflation that existed in Brazil during the period of investigation,[9] replacement costs such as those used in the multiplier would not take into account the rapidity with which costs rise, and therefore the ITA's equation could overstate GS&A expenses.

The Court found that the ITA's use of inconsistent figures did have the potential to exaggerate CCM's GS&A expenses,[10] but it remained unclear whether the overstatement of GS&A expenses could be eliminated if the ITA were to use consistent figures in its ratio. *Id.* at 904–05. The Court therefore remanded this issue to the ITA "to explain in greater detail its reasoning" for using replacement cost figures in its attempts to adjust for inflation, and to recalculate the allocation of CCM's GS&A expenses if the ITA found its methodology to be systematically overstating those expenses. *Id.* at 905.

The ITA found on remand that its formula potentially overstated the GS&A expenses, and that it would not be able to calculate GS&A expenses using current COM figures without the risk of overstatement. Preliminary Remand Results at 4–5. Thus, the ITA

recalculated GS&A using the same ratio derived from historical values as had been used in the Final Determination and applied that ratio to the cost of manufacturing determined upon an historical, rather than a replacement, cost basis. By calculating the ratio upon

[9] Brazil was experiencing inflation of more than 80% per month during the period of investigation. *See Camargo Correa Metais S.A.*, 17 CIT at 899.

[10] "The record reveals that CCM's recorded historical monthly materials costs were systematically less than the replacement costs used by the ITA. * * * [T]he inevitable result of this is that the sum of the monthly replacement costs * * * divided by the reported annual COS would be greater than one. Therefore, the total prorated GS&A costs for the year would exceed the reported annual GS&A costs * * *." *Camargo Correa Metais, S.A.*, 17 CIT at 905.

an historical basis and applying it to an historically-based COM, Commerce ensured that no systematic overstatement of CCM's GS&A occurred.

Def.'s Reply to Def.-Intervenors' Comments Upon Dep't of Commerce's Remand Results at 4. CCM was satisfied that the ITA's remand methodology eliminated the earlier distortions which led to an overstatement of its GS&A expenses, and requested that the Court affirm the remand results.

As noted above, however, defendant-intervenors do not share the accord reached between CCM and the ITA with regard to the revised GS&A methodology. Because this Court remanded the GS&A issue not only to obtain an explanation of the ITA's reasoning but also to fully reconsider the issue,[11] and because the *Judgment* was vacated and the case returned, no issues having been decided, the Court is willing to consider and appreciates the added guidance in the defendant-intervenors' comments. However, the Court finds the defendant-intervenors' arguments to be without merit.

Defendant-intervenors advance two arguments in challenging the ITA's Final Remand Results. First, they assert that the ITA's remand methodology results in an understatement of CCM's GS&A expenses. This concern is based on the fact that in a hyperinflationary economy, there is a significant difference between the historic and current costs of inputs even over short time spans. The ITA's normal method of adjusting for hyperinflation is to compare the GS&A expense for a given month—the numerator in the ITA's equation—to the cost of goods sold for the same month—the denominator. In this manner, the ITA accounts for inflation because all the prices in its ratio rise at the same rate. In its review period in this case, however, the ITA had only an annual, not month-to-month, breakdown of GS&A information. The parties dispute the proper method for allocating the GS&A expenses over the period of investigation, which consisted of six months in this case.[12]

Defendant-intervenors argue that the ITA should evenly distribute annual GS&A expenses for each month, and that CCM's GS&A expenses as calculated in the Final Remand Results are lower than they would have been if evenly allocated. CCM and the ITA both argue that even allocation would misrepresent the real expenditures in the actual months under investigation. In order to account for the natural peaks and valleys which occur in GS&A expenditures over the course of an entire year, the totality of which could not be captured during an investigation period lasting only half the year, the ITA allocated the portion of annual GS&A expenses which could be attributed to normal activity during the particular months of investigation. The ITA demonstrated

---

[11] *See Camargo Correa Metais S.A.,* 17 CIT at 905.

[12] The period of investigation in this case was March 1, 1990, through August 31, 1990. *Final Determination of Sales at Less Than Fair Value: Silicon Metal from Brazil,* 56 Fed. Reg. at 26,978.

that such things as year-end bonuses for executives could inflate the overall annual GS&A expense report but would not actually occur during the March-to-August period under investigation. Tr. at 26–27. Thus, a given month's GS&A expenditures could appear to be less than an even twelve-month division of the annual figure would indicate, but the record does not support the conclusion that the figure was understated for the specific months in this case. Rather, the ITA's application of a ratio based on historic data results in an absolute GS&A expense value for the actual period under review. Final Remand Results at 6–7. By using consistent time frames, the ITA ensured that inflationary price increases occurred at the same rate during the same period for each figure in the ratio. The Court agrees with CCM and the ITA that the Final Remand Results properly account for the reality of Brazil's hyperinflationary economy and the data on the record without overstating the GS&A expenses. The Court finds that the defendant-intervenors have not demonstrated that the ITA Final Remand Results are unreasonable and their first argument is therefore dismissed.

The defendant-intervenors' second argument is that the remand methodology permits manipulation of GS&A expense figures and potentially permits exporters to improperly reduce the dumping margin. This concern focuses on the ITA's use of historical COM and the theory that a foreign producer could embed understated costs in its historical COM by aligning export sales with the months in which it uses items from inventory. That is, sophisticated bookkeeping could take advantage of an inflationary economy by recording a products' inputs—its historic COM—at the lower costs that existed when the inputs were placed in inventory, and avoid the inflation-adjustment mechanism in the ITA's methodology for a product exported months after the input is removed from inventory and incorporated into the final product. In this manner, a foreign producer could presumably reduce the amount of GS&A allocated to the COP.

This argument is also rejected. Defendant-intervenors have not demonstrated beyond mere intimation that the ITA's methods could be subject to such manipulation or that such manipulation occurred in this case. The record is devoid of any evidence that the numbers CCM provided the ITA are anything other than the actual values incurred and expended within the ITA's period of review. While the Court will consider all potential flaws in any ITA methodology, the Court will not chase every shadow which a party may throw over an agency determination. Defendant-intervenors simply have not demonstrated that the ITA's methodology is unreasonable. The Court agrees with CCM and the ITA that the remand methodology creates the consistency which was lacking in the Final Determination, and finds that the remand result is supported by substantial evidence and otherwise in accordance with law. Thus, as to the GS&A issue, the Final Remand Results comply with the remand order of this Court and are affirmed.

### III. THE VALUE-ADDED TAX ISSUE.

The ITA's treatment of the Brazilian value-added tax ("ICMS" or "VAT") is the final remand subject and is discussed in two parts. The first involves plaintiff CCM and a dispute as to whether the total amount of CCM's ICMS liability should be included in its cost of production. The second part addresses plaintiff CBCC and a potential conflict in statutory interpretation which arose in determining CBCC's constructed value for comparison with U.S. price. The Court begins by discussing the analytical and factual background germane to the ICMS issues of both parties.

The disputes over the ICMS issue arise from the inherent character of a value-added tax as a multi-stage sales tax and Brazil's unusual credit system. In Brazil, as in most countries which employ a VAT system, companies such as CCM and CBCC pay ICMS on their purchases and collect ICMS from sales to their customers. CCM and CBCC both purchase materials, such as charcoal and quartz, for the production of silicon metal. CCM and CBCC pay ICMS tax on the purchases of these material inputs. Once the inputs are incorporated into an improved product, CCM and CBCC collect ICMS taxes on sales to their home market customers. "The amount of ICMS paid on purchases is subtracted from the amount collected, and the difference is remitted to the Brazilian government."[13]

Like most countries, Brazil does not charge and producers like CCM and CBCC do not collect an ICMS tax on export sales. Unlike most countries, Brazil does not offer a direct rebate or remittance for the uncollected tax. Most countries typically rebate or remit the amount of tax a producer paid to acquire the materials incorporated into its finished or improved export product. Brazil, however, offers the producer a credit which it can use to off-set the net amount of tax otherwise due the Brazilian government. "[I]f the ICMS paid on production [at the first stage of the VAT system in the transaction with the supplier] exceeds the amount collected for domestic sales, then the company receives a credit for the difference, but no refund." *Camargo Correa Metais, S.A.*, 17 CIT at 906. CCM and CBCC both dispute the ITA's treatment of the amount of this credit in its FMV calculations.

In determining the FMV of a product for comparison with USP, the ITA normally uses the foreign producer's home market sales price for the product in question. 19 U.S.C. § 1677b(a)(1)(A) (1988). In this case, the ITA determined that the home market sales prices charged by both CCM and CBCC were below the cost of production (COP), and therefore the ITA used the constructed value (CV) of the companies' products to establish FMV. *Final Determination of Sales at Less Than Fair Value:*

---

[13] *Camargo Correa Metais, S.A.*, 17 CIT at 905. As the Court noted in *Camargo I*, "[a] numerical hypothetical is instructive. * * * If the ICMS were 10%, and CCM paid $60 per ton for inputs to its production exclusive of ICMS, it would pay $6 per ton in ICMS on those inputs. If it sold that production domestically for $100 per ton exclusive of ICMS, it would then charge its customers $10 per ton in ICMS. Of this $10, $6 would be offset by the VAT paid on inputs and $4 would be remitted to the government." *Id.* at 905–06. *See also* Def.'s Reply to Def.–Intervenors' Comments Upon Dep't of Commerce Remand Results at 15, n.6, n.7.

*Silicon Metal from Brazil*, 56 Fed. Reg. at 26,979. CCM disputed the ITA's COP calculation which led to the ITA's decision to use CCM's CV. CBCC disputed the ITA's CV calculation itself.

A. THE ITA'S TREATMENT OF ICMS WITH RESPECT TO CCM.

The ITA determined that it should use CV to establish CCM's FMV after finding CCM's home market sales price to be less than its COP. *Id*. One of the costs included in calculating CCM's COP was the total amount of ICMS that CCM paid to suppliers and received from home market customers.[14] CCM agreed that the ITA appropriately accounted for ICMS by including it in home market sales price, but challenged the extent to which ICMS should be included in COP. The ICMS liabilities that CCM incurred in home market transactions with suppliers and customers were clearly part of its home market sales price, but it remained unclear whether CCM's COP should include the total ICMS amount. CCM argued that the total amount of its ICMS liability *minus* the ICMS tax credit due to export should have been included in its COP. Since the vast majority of CCM's production is for export, CCM obtained a large credit but was unable to make use of the entire credit. CCM's credit was more than sufficient to off-set the entire amount of ICMS it collected on its few domestic sales. Thus, CCM argued, its COP should only include the ICMS amount incurred on its inputs purchases because the ICMS liability incurred due to CCM's value added—which would be captured by a home market sale—is not actually paid when the product is exported. *Camargo Correa Metais, S.A.*, 17 CIT at 906–08.

The ITA included the full ICMS amount, incurred with both supplier and customer, in the home market sales price and COP, but did not explain its reasoning for doing so. In *Camargo I*, this Court stated that "elucidation of the method [for determining COP] is delegated to the ITA," and "a reasonable interpretation of the antidumping statutes may permit or require that CCM's ICMS be accounted for as the ITA has argued." *Id.* at 908. However, the Court found that the ITA had failed to fully explain its reasoning for including the full amount of ICMS in both home market sales price and COP. *Id.* Therefore this Court remanded the ICMS issue "for the ITA to specifically address how and why the COP and home market price should account for the fact that CCM does not pay the ICMS it collects from its Brazilian customers to the Brazilian government." *Id.* at 908–09.

On remand, the ITA addressed the circumstances of the Brazilian VAT system and determined that ICMS incurred on home market sales is a cost of producing its goods, which must be included in both home market sales price and COP. The ITA noted that in calculating COP, it is required to examine whether sales *in the home market* were made at prices less than the cost of producing the merchandise for sales in the

---

[14] The ITA originally excluded ICMS from CCM's home market sales price and COP. *Final Determination of Sales at Less Than Fair Value: Silicon Metal from Brazil*, 56 Fed. Reg. at 26,979, 26,984. The ITA then conceded before this Court that it should have included ICMS in CCM's home market sales price and COP. *Camargo Correa Metais, S.A.*, 17 CIT at 905, 907. The ITA maintains that it should include the total ICMS amount in both.

home market, and COP must include "all costs" incurred on home market sales. Preliminary Remand Results at 6–8; 19 U.S.C. § 1677b(b) (1988). The ITA argued that while it is true that CCM does not incur an ICMS liability on export sales and the Brazilian government would owe CCM a tax credit for ICMS not collected by reason of those export sales, "the manner in which the Brazilian government makes good upon its debt to CCM is irrelevant for COP purposes." Final Remand Results at 5. The home market sales alone set the costs which the ITA must include in its analysis. Since the "ICMS liability arises only in connection with a sale in the home market" that "liability is a cost of producing the subject merchandise for sale in the home market" and must be "included in both home market price and COP." Final Remand Results at 6.

The Court finds that the ITA's decision to focus exclusively on costs incurred in the home market is in accordance with law. The record supports the ITA's conclusion that CCM accrues an ICMS liability in the home market equal to the amount of ICMS due on sales to its customers.[15] Thus, the ICMS liability is a home market cost that must be used in determining the relationship between home market sales price and COP by fully including it in both. The Court finds that the ITA's inclusion of the total amount of CCM's accrued home market ICMS liability in the home market sales price and COP is supported by substantial evidence, in accordance with law, and is affirmed.

### B. THE ITA's TREATMENT OF ICMS WITH RESPECT TO CBCC.

In its Final Determination, the ITA found CBCC's home market sales to be at less than the cost of production, and thus used constructed value to establish foreign market value for comparison with the United States price. *Final Determination of Sales at Less Than Fair Value: Silicon Metal from Brazil*, 56 Fed. Reg. at 26,979. As required by statute, 19 U.S.C. § 1677b(e) (1988), the ITA determined CV based on the total costs of all materials in CBCC's silicon metal production, including the cost incurred due to the ICMS tax. *Id.* at 26,986. CBCC challenged the ITA's CV calculation, pointing out that 19 U.S.C. § 1677b(e) also requires the ITA to exclude from CV "any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used." 19 U.S.C. § 1677b(e)(1)(A) (1988).

CBCC contended that its ICMS liability qualified as an internal tax remitted or refunded on export which should not be included in the CV determination. As discussed with regard to CCM, the ICMS tax is not collected upon export. Unlike CCM, a substantial portion of CBCC's production is sold in Brazil. *Camargo Correa Metais, S.A.*, 17 CIT at 909.

---

[15] To continue the "numerical hypothetical," *see supra* footnote 13, CCM accrues an ICMS liability of $10 in its home market sales (10% charged on a sale of $100 value). CCM pays the first $6 of the ICMS liability to the government through its supplier upon purchase of inputs (10% of $60 paid). Subsequently, upon a home market sale of an improved product, CCM owes the difference, or $4, directly to the government. Regardless of how or when the tax liability is remitted to the government, the net result is that CCM accrues a tax liability totaling $10 that is a part of its home market cost of producing the improved product.

CBCC was able to use the entire credit from its export activity to off-set a significant amount of the ICMS paid on inputs for export production. CBCC argued that this tax credit was the functional equivalent of a remittance that is recovered on export for purposes of 19 U.S.C. § 1677b(e)(1)(A) and that therefore the ITA should exclude ICMS from CV. *Id.*

The Court agreed with CBCC to the extent that the constructed value provision requires the exclusion from CV of a remitted-on-export tax and the ICMS credit system appeared to be such a tax. *Id.* at 909–10. However, the complementary USP provision created a conflict which neither party adequately addressed and which prevented the Court from holding in CBCC's favor at the time. Together, the CV and USP provisions could potentially count the total ICMS amount twice: "To include the amount of tax not collected by reason of export in the USP and exclude the same amount from constructed value results in a reduction of dumping duties of twice the amount of the tax. This is double counting." *Id.* at 910. The Court remanded the issue of "this potential collision between § 1677a and § 1677b" with instructions to the ITA "to articulate a method and rationale for the treatment of ICMS exemptions due to export under the two statutory provisions that both recognizes the economic reality of non-payment due to export and avoids double counting." *Id.*

This task has apparently proved difficult. In its Final Remand Results, the ITA accounted for ICMS paid upon inputs used in silicon metal production by excluding that amount from CV. However, in its reply to defendant-intervenors' comments made after the CAFC remand and in a hearing before this Court, the ITA reversed itself. The ITA now asserts that ICMS taxes should be *included* in CV, and seeks to have its original methodology with respect to the ICMS issue from the Final Determination affirmed. The ITA requests a remand in order to re-calculate the dumping margin in accordance with its latest position that the ICMS taxes should be included in CV.

Defendant-intervenors also argue that the changed ITA position requires a remand. To simply affirm the Final Remand Results and provide the CAFC with a record supporting the Final Remand Results, the defendant-intervenors assert, would not be in the interests of justice where the agency charged with administering the antidumping laws itself no longer believes the Final Remand Results to be legally correct.[16] The Court agrees that it would be inappropriate to affirm, out of hand, a determination that is no longer supported by the administering agency. The Court therefore has considered the comments of the ITA and defen-

---

[16] At a hearing on this issue before this Court on January 17, 1996, counsel for the ITA supported the defendant-intervenors' position, stating that "it would only serve the interests of justice * * * to put before the judicial review process the Agency determination that [is] really in play. It would not serve the interests of justice for this Court to review a decision that is not endorsed by the Agency charged with the administration of the statute, or for the Appellate Court to review this Court's decision reviewing the Agency's now-defunct determination." Tr. at 21.

dant-intervenors presented to the Court after the issuance of the Final Remand Results, and finds that a further remand is required.

The focus of this review must again begin with an examination of the unusual Brazilian ICMS credit system.[17] In most countries which have a value-added tax system, the VAT is not imposed on exported products and the amount of VAT that a producer paid to its supplier on inputs purchases is directly rebated to the producer of the improved, exported product. Brazil's system employs only the first of these two steps: it does not impose its VAT, the ICMS, on exports, but it also does not directly rebate the amount of ICMS paid on inputs to the producer. Rather, the ICMS paid on inputs is returned to the producer through a credit, which the producer can use to off-set ICMS liabilities on its home market sales to the extent that it has any home market sales. *Camargo Correa Metais, S.A.*, 17 CIT at 905–06, 909.

The ITA and defendant-intervenors argue that the CV statute only contemplated the exclusion of a remittance or refund in the typical system of most countries, and that the Brazilian credit system is not the equivalent of a remittance or refund. The Brazilian ICMS credit is an off-set against home market sales and is not a direct return of monies paid out. A company that has no home market sales cannot benefit from the accrued ICMS credit; a producer with only export sales or very few home market sales cannot take advantage of the fact that no ICMS is charged on the export sales.[18] The ITA and defendant-intervenors conclude from these facts that, because the ICMS credit is unavailable to a producer who has more export than home market sales, or who has only export sales, the ICMS credit cannot be said to be a refund "by reason of" export. The ITA and defendant-intervenors argue that the ICMS credit is activated only by reason of home market sales and therefore cannot qualify for the statutory exclusion from CV. Def.-Intervenors' Comments on Dep't of Commerce Remand Results at 10–16; Def.'s Reply to Def.-Intervenors' Comments on Dep't of Commerce Remand Results at 15–18.

In the ITA and defendant-intervenors' interpretation that a tax "credited" is not the equivalent of a tax "remitted or refunded" for purposes of the CV statute, the amount of CBCC's ICMS paid on inputs for exported products should remain embedded in the product, and the ICMS would be properly accounted for by including it in CV. The Court agrees that this interpretation would eliminate the threat of double counting because it would not trigger the complementary "rebated" or "not collected" phrases in the USP provision; only a tax which qualifies

---

[17] The CAFC admonished that "a ruling by this court on the merits of this case may have a significant impact on the future calculation of dumping margins for exporters from a large number of important exporting nations that employ value added taxes in their domestic revenue production operations." *Camargo Correa Metais, S.A.*, 13 Fed. Cir. (T) at ____, 52 F.3d at 1042. The Court notes that the Brazilian ICMS credit system is distinguishable from that of most nations that employ a VAT and direct rebates or remittances, not a credit system.

[18] Plaintiff CCM, for example, has very few home market sales and a "great preponderance" of export sales, and therefore "does not recoup the full amount of the ICMS it pays on inputs." *Camargo Correa Metais S.A.*, 17 CIT at 906; *Final Determination of Sales at Less Than Fair Value: Silicon Metal from Brazil*, 56 Fed. Reg. at 26,984.

for exclusion from CV could qualify for inclusion in USP.[19] However, the Court rejects the argument that the credit is not the equivalent of a refund, and does not arise "by reason of" export.

The ITA and defendant-intervenors are incorrect that the ICMS credit arises only by reason of home market, not export, sales, because the credit does not exist at all without the event of export sales. The fact or absence of home market sales is irrelevant in determining whether there has been a rebate or remittance because the statutory language requires the ITA to consider only the exported article or merchandise.[20] Regardless of whether a producer can take advantage of the credit, the credit arises solely and precisely because ICMS taxes normally due on a product are not collected upon the exportation of the product. The ITA should not be engaged in an investigation to determine how much of the credit was actually used, but rather should rely on the bright line established by the fact that the credit accrues upon exportation, and the accrued amount should be excluded from CV. In *Camargo I*, this Court found that the credit system fit well within the definition of "remit" and stated that the ICMS credit accrued upon export "appears to fall within the purview of 19 U.S.C. § 1677b(e)(1)(A)" and thus should be excluded from CV. *Camargo Correa Metais S.A.*, 17 CIT at 909. The Court has not been persuaded that its conclusions in *Camargo I* were wrong, and only the failure of the ITA to explain how the ICMS credit could be excluded from CV and included in USP, without resulting in double counting, prevented the Court from holding that the credit did qualify for exclusion from CV. *Id.* at 909–10.

The ITA failed to consider this Court's finding that the credit is the equivalent of a rebate or remittance. By considering the credit not to be a remittance, the ITA was able to avoid the double counting issue. However, since the credit has been found to be a remittance, the Court is concerned that the conflict between 19 U.S.C. § 1677b(e)(1)(A) (1988) and 19 U.S.C. § 1677a(d)(1)(C) (1988) is still unresolved.

The respective statutes require a tax such as the ICMS to be accounted for both in CV and USP: if the tax is rebated or remitted by reason of export, then it must be included in USP and excluded from CV.[21]

---

[19] *Compare* 19 U.S.C. § 1677b(e)(1)(A) (1988) (CV "shall be the sum of—(A) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article * * *)") *with* 19 U.S C. § 1677a(d)(1)(C) (1988) (USP "shall be adjusted by being—(1) increased by—(C) the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been rebated, or which have not been collected by reason of the exportation of the merchandise * * *").

[20] *See* 19 U.S.C. § 1677b(e)(1)(A) (1988) *and* 19 U.S C. § 1677a(d)(1)(C) (1988). The ITA itself argued, in its decision to include the full ICMS amount in both the home market price and COP of plaintiff CCM, that the manner in which the Brazilian government rebates or credits the ICMS which is not charged on exports is irrelevant. Final Remand Results at 5–6. The ITA concerned itself only with the fact that the credit had accrued, even though the value of the unused portion of CCM's credit was rapidly destroyed by Brazil's hyperinflation. *Camargo Correa Metais S.A.*, 17 CIT at 906.

[21] *See supra* footnote 19. The most recent attempts by Congress to address the issue of tax remittance for exported products have eliminated the adjustments to USP, now called "export price," and focused exclusively on adjustments to FMV, now called "normal value" under the new nomenclature. *See* 19 U.S.C. § 1677b(a)(6)(B)(iii) (1994). This "constitutes a change from the existing statute ' * ' which provides for an adjustment to export price [USP], rather than an adjustment to normal value [FMV], for these indirect taxes. ' * * This new section expressly precludes the double-counting of adjustments." S. Rep. No. 412, 103rd Cong., 2nd Sess., at 70 (1994). Thus the double counting issue is limited to cases such as this which must be decided under the pre-1994 statutory provisions.

The ICMS credit is a rebate or remittance and "adjustments to USP are the sole statutory allowance for [such] forgiven taxes." *Zenith Electronics Corp. v. United States*, 11 Fed. Cir. (T) 57, 63, 988 F.2d 1573, 1580 (1993). FMV and its surrogate CV focus on the home market costs and include the ICMS amount. Because that amount is not collected on export, the ITA must ensure that the difference between a home market price including this tax and a USP not including this tax does not by itself give rise to a dumping margin. The statutory inclusion of the tax in USP is meant to prevent this possibility and create the required apples-to-apples comparison. *See id.*, 11 Fed. Cir. (T) at 63–66, 988 F.2d at 1580–82; *accord E.I. DuPont de Nemours & Co., Inc. v. United States*, 17 CIT 1266, 1272–1278, 841 F. Supp. 1237, 1243–1247 (1993). Thus, USP must be increased "to the extent that [the home market] taxes are added to or included in the price of such or similar merchandise when sold in" the home market. 19 U.S.C. § 1677a(d)(1)(C) (1988). The problem is that 19 U.S.C. § 1677b(e)(1)(A) requires CV to be reduced by the same extent to which USP is increased.[22] This is double counting, and, rather than an apples-to-apples comparison, the result is an artificially deflated dumping margin.[23]

The Court remands the ICMS issue to the ITA. The Court has found the ICMS credit to be indistinguishable from a remittance or refund. By virtue of this finding, the amount of ICMS not collected by reason of export must be included in USP. Including ICMS in USP triggers the double counting problem. The Final Determination, which the ITA seeks to have affirmed in place of its remand determination, addresses none of this. The ITA has ignored the Court's findings and remand order from *Camargo I* that the credit is the equivalent of a remittance or refund, and the ITA cannot simply seek the reinstatement of the terse conclusion in its original, misnomed Final Determination that ICMS should be included in CV.[24] The ITA has not extinguished the Court's original dissatisfaction with the Final Determination expressed in *Camargo I*, nor offered any reason to avoid the Court's original findings. Therefore, the ITA is instructed in formulating its remand determination to (1) consider the credit to be a rebate or remittance for purposes of the cited statutes, (2) propose a method to eliminate or account for the double counting problem, and (3) recalculate the dumping margin for plaintiff CBCC accordingly.

---

[22] The home market value of CBCC's merchandise for FMV or CV purposes is home market price plus $x$, where $x$ equals the amount of VAT that CBCC must remit to the Brazilian government on its home market sales. To account for the fact that no VAT is charged on export sales, the statute requires the ITA to adjust USP by adding $x$. Unfortunately, the CV statute requires the exclusion of this same amount, $x$, from the CV calculation, leading to a distortion on the basis of taxes which the statutes were ostensibly designed to prevent.

[23] Since USP will be higher and CV lower, USP will appear less damaging to domestic industry in the antidumping investigation.

[24] The Final Determination states simply that "[t]he ICMS tax is paid on the material inputs of the exporter product and is not remitted or refunded upon exportation. Therefore, we included ICMS taxes paid on inputs in the constructed value." *Final Determination of Sales at Less Than Fair Value: Silicon Metal from Brazil*, 56 Fed. Reg. at 26,986. The Court requires more and the fact that plaintiff CCM conceded that ICMS taxes should be included in its CV, *id.* at 26,984, should not affect nor be sufficient grounds for the ITA's explanation.

## CONCLUSION

For the foregoing reasons, the Court affirms the ITA's Final Remand Results in all respects except the treatment of ICMS as to plaintiff CBCC. The Court remands the case to the ITA for redetermination consistent with this opinion.